**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOE ALMON, JON CARNLEY, CYNTHIA CLARK, JACKIE DENSMORE, JENNIFER KREEGAR, HAROLD MCPHAIL, JB SIMMS, KENNETH TILLMAN, on behalf of themselves and all others similarly situated | § § § § § § § | |
| *Plaintiffs* | § | |
| -vs- | § § | SA-19-CV-01075-XR |
| CONDUENT BUSINESS SERVICES, LLC, COMERICA, INC.,  COMERICA BANK, | § § § | |
| *Defendants* | § | |

## ORDER

On this date, the Court considered (1) Defendant's motion for summary judgment (ECF No. 62); Plaintiffs' response in opposition (ECF No. 67) and Defendants' reply (ECF No. 69); and (2) Plaintiffs' motion for class certification (ECF No. 56); Defendants' response in opposition (ECF No. 61); and Plaintiffs' reply (ECF No. 66). After careful consideration, the Court issues the following order.

## BACKGROUND

This action arises out of Defendants' administration of the Direct Express program, which provides prepaid debit cards to federal benefit recipients who receive their benefits electronically. Plaintiffs are current and former customers of Defendants Conduent Business Services LLC and Comerica, Inc. who assert that unauthorized users withdrew funds from their Direct Express accounts and that Defendants failed to properly respond to the fraudulent transactions, thereby violating the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1963, *et seq.*, its implementing regulations ("Regulation E"), 12 C.F.R. § 1005.1, *et seq.*, and the Terms of Use that constitute the contract between the parties.

## I.      The Direct Express Fraud-Reporting Framework

The Direct Express program allows millions of recipients of Americans to receive social security, disability, veterans', and other federal benefits electronically, through a prepaid debit card, rather than by paper check or direct deposit into a bank account. *See* ECF 56-2 (Direct Express FAQ); ECF No. 61-1, Declaration of Mitch Raymond (hereafter, "Raymond Decl.") ¶ 5. Comerica, Inc. and Comerica Bank (collectively, "Comerica") were awarded the contract for this program by the Bureau of the Fiscal Service–U.S. Department of Treasury in 2015 and again in 2020, and have been paid in excess of $415 million for heading the program. *See* ECF No. 66-1, Taylor Dep. at 38:20–39:24. Comerica, in turn entered into an agreement with Conduent Business Services, LLC ("Conduent") to administer the Direct Express Program.[1] ECF No. 56-5, Raymond Dep. at 37:9–18. Each month, Direct Express enrollees automatically receive their benefits via direct deposit to their debit cards.

### A.   EFTA and Regulation E – Statutory and Regulatory Requirements

Because the Direct Express program involves the use of a debit card that is used to make cashless transactions electronically, it is governed by EFTA and its related regulatory framework, known as "Regulation E". *See* 15 U.S.C. § 1693a; 12 C.F.R. § 1005.1 (2016).[2] Congress enacted the EFTA as part of the comprehensive Consumer Credit Protection Act (the "CCPA"), Pub. L. No. 95–630 § 2001, 92 Stat. 3641 (1978) (codified as amended at 15 U.S.C. § 1601 *et seq*.). The purpose of EFTA and Regulation E is to establish the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. 15 U.S.C. § 1693(b). "The primary objective of

---

[1] In addition to Conduent, Comerica engaged a second entity—i2c, Inc.—to handle various customer service aspects of the Direct Express program, including claims of fraudulent transactions. *See* ECF No. 62 at 2. However, the parties do not dispute that all Plaintiffs to this action interacted with Conduent rather than with i2c, Inc. *See id.*

[2] Regulation E has since been revised in April 2019 and July 2020. Because the transfers at issue in this case occurred prior to those changes, the November 14, 2016 version of the regulation applies. Accordingly, all subsequent citations to Regulation E refer to the 2016 version.

EFTA, however, is the provision of . . . consumer rights." *Id.* Accordingly, "[t]he EFTA, like the [Truth in Lending Act ("TILA")] and other CCPA provisions, is a remedial statute accorded "a broad, liberal construction in favor of the consumer." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998) (citations omitted).

The statute provides that the customer must, orally or in writing, notify the institution of any errors relating to electronic fund transfers within 60 days of the customer's receipt of the bank statement or other document detailing the alleged erroneous electronic fund transfer. 15 U.S.C. § 1693f(a). Once the institution is properly notified, the institution is required to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." *Id.*

The EFTA includes mandatory requirements in 15 U.S.C. § 1693f and the applicable regulation—12 C.F.R. § 1005.11—including several provisions related to timing. First, Defendants are required to investigate promptly and determine whether an error occurred within ten business days of receiving notice from the cardholder. *See* 12 C.F.R. § 1005.11(c)(1). Second, if they are unable to complete the investigation within ten business days, they may take up to 45 days to investigate, provided a provisional credit is issued in the amount of the alleged error. *Id.* at (c)(2). Third, if the error involves an electronic funds transfer that was not initiated within the United States, 90 days are allowed. *Id.* at (c)(3)(ii). Collectively, these are referred to as the "10/45/90 requirements."

The financial institution may require written confirmation to be provided to it within ten business days of an oral notification of error if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent. If the written confirmation is not received within the ten-day period, the financial institution need not

provisionally recredit a consumer's account and cannot be held liable for treble damages. *See* 15 U.S.C. § 1693f(a). If a provisional credit is issued, the consumer is entitled to full use of the provisional funds during the pendency of the investigation. 15 U.S.C. § 1693f(c).

Where the financial institution determines that an error did occur, the EFTA requires that it credit the consumer's account, with interest, within "one business after such determination." 15 U.S.C. § 1693f(b). Conversely, if after investigation the financial institution determines that an error did *not* occur, "it shall deliver or mail to the consumer an explanation of its findings within [three] business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur." 15 U.S.C. § 1693f(d).

The institution's failure to comply with these rules gives rise to civil liability pursuant to 15 U.S.C. § 1693m. The EFTA additionally provides for treble damages where the financial institution fails to provisionally recredit a consumer's account within the ten-day period and either (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error. 15 U.S.C. § 1693m(e)(1). A financial institution is also liable for treble damages if it knowingly and willfully concludes that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation. 15 U.S.C. § 1693m(e)(2). Under its contract with Comerica, Conduent is evaluated on whether it complies with the 10-day, 45-day, and 90-day investigation requirements. ECF No. 56-5, Raymond Dep. at 39:17–23. Conduent and Comerica keep detailed records regarding whether Conduent has performed up to these standards. *See* ECF No. 56-15.

### B.   Terms of Use – Applicable Contractual Provisions

When a debit card is issued through the Direct Express benefits program, it is accompanied by a "Terms of Use" agreement (the "Agreement"). The Agreement details what procedures cardholders should follow if they believe their card has been lost, stolen, or compromised through unauthorized or fraudulent charges. Specifically, the Agreement directs customers to "Call the Customer Service number below or write to us at the address described below as soon as you can if you think an error has occurred in your Card Account." *See* ECF No. 31-1 at 2.

The Terms of Use also describe a claim-resolution process that tracks the requirements of the EFTA and Regulation E. Section 9 provides that, in case of errors or questions about transactions, cardholders should call the Customer Service number with the following information:

a.   Your name and Card number.
b.   Why you believe there is an error, and the dollar amount involved.
c.   The approximate date when the error took place.

*Id.*; *see* 12 C.F.R. § 1005.11(b)(1)(i)–(iii) (setting forth notice requirements under Regulation E).

Section 8 limits a cardholder's liability with respect to fraudulent or unauthorized transactions on their accounts:

> Tell us AT ONCE if you believe your Card or PIN has been lost or stolen. Telephoning us at the Customer Service number is the best way of keeping your possible losses down. You could lose all the money associated with your Card. **If you tell us within two business days, you can lose no more than $50 if someone used your Card or PIN without your permission. If you do NOT tell us within two (2) Business Days after you learn of the loss or theft of your Card or PIN, and we can prove that we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.**

> If you can't telephone us, you can write to us at Direct Express, Payment Processing Services, P.O. Box 245998, San Antonio, TX 78224-5998. If you are a California resident you will not be liable for the $500 amount described above in any event. If you are a New York resident, your liability for the unauthorized use of the Card will not exceed $50.

ECF No. 31-1 at 2 (emphasis added).

## II.     Plaintiffs' Experiences with Conduent's Fraud-Reporting Process

Because the specific experiences of the named Plaintiffs bear on the parties' arguments in the briefing on both motions, the Court will briefly describe them here.

### A.  Jon Carnley

Plaintiff Carnley has received disability benefits through the Direct Express program since 2012. *See* ECF No. 59-3 at 188. In November 2018, Carnley identified an unauthorized ATM withdrawal of $504. ECF No. 62-19, Carnley Dep. at 104:13–22. On November 22, he called Direct Express to challenge the transaction as unauthorized. *See* ECF No. 59-3 at 341. Direct Express investigated the claim, and on January 4, 2019, informed Carnley that fraud could not be determined based on the information provided such that his claim was denied. *Id.* at 387. Just a few days later, however, on January 8, Direct Express issued a credit to Carnley for the full amount of this claim. *Id.* at 388; *see also id.* at 320–21 (transaction history showing credit to account).

In January 2019, Carnley asserted a series of additional claims of unauthorized transactions. On January 4, he challenged a $44.85 ATM withdrawal fee, which was credited to his account on January 8, 2019. *Id.* at 393. On January 15, he disputed a $464.88 money order as fraudulent, for which he received a provisional credit on January 18, which was made permanent on March 11. *Id.* at 407–08. On January 17, 2019, Carnley claimed that five different transactions, totaling $247.76, were also unauthorized. *Id.* at 411–17. On January 23, 2019, Direct Express informed Carnley that, after investigating his claims there was a conflict in information regarding these transactions such that Direct Express could not determine whether fraud occurred. *Id.* at 420. On that basis, Direct Express denied this final claim. *Id.* at 421. Carnley terminated his relationship with Direct Express shortly thereafter.

Carnley alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See* ECF No. 31 ¶¶ 61, 77.  He further alleges that Defendants failed to provide a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶¶ 89, 221–22.

### B.  Joe Almon

Plaintiff Almon received Social Security retirement benefits through the Direct Express program. ECF No. 62-2, Almon Dep. at 9:1–2, 14:3–6. 46:6–9. On November 21, 2018, Almon received a low balance alert from Direct Express, and after he checked his account records, he noticed pending transactions posted earlier that day that he believed to be unauthorized. *Id*. at 17:1–11. Both transactions involved a business called "Joe Almon and Co" and, in total, they amounted to $793.78. *Id*. at 65:3–21.

Almon called the Direct Express Customer Service line after investigating the charge history on the morning of November 21. *Id*. at 55:6–56:4. The Direct Express representative canceled Almon's card, but told him the charges could not be stopped and that he would need to call a different department if he wished to make a claim for reimbursement once the charges closed. *Id*. at 56:21–57:1, 75:2–8. As directed, Almon contacted the Fraud Services Department and reported his claim on December 2, 2018, and later provided written confirmation of his claim. *Id*. at 70:21–71:31, 77:9–14. In a letter dated December 15, 2018, Direct Express notified Almon that its investigation was complete and that his claim had been denied. *See* ECF No. 62-13. Almon requested the documents upon which Direct Express had relied in making its determination. ECF No. *See* ECF No. 56-24, Almon Decl. ¶ 12; ECF No. 59-3 at 10. Conduent's records indicate that the investigative documents were mailed to Almon on the same day. ECF No. 59-3 at 10.

Almon continued to challenge this claim, and in mid-January 2019, Direct Express sent a letter to Almon stating that it would investigate his claim further and that he would receive a provisional credit for the full amount of the disputed transactions while the investigation was pending. ECF No. 62-14. Mr. Almon received the credit into his account, spent it shortly thereafter, and then stopped using the card altogether. *See* ECF No. 62-2, Almon Dep. at 89:7–11; *see also* ECF No. 62-15. In late February, Direct Express had completed its further investigation and informed Almon that his allegations of fraud could not be confirmed. *See* ECF No. 62-16 at 3. Direct Express reversed the provisional credit, but because Almon no longer deposits any funds into his account, it continues to show a negative balance of $793.78. *See* ECF No. 62-17 at 2.

Almon alleges that Defendants have failed to provide him with a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶¶ 76, 221–22. He further alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See id.* ¶¶ 61, 77.

## C.  Harold McPhail

Plaintiff McPhail is a disabled veteran who received federal benefits through the Direct Express program. ECF No. 56-25, McPhail Decl. ¶ 3. McPhail has occasionally authorized his children to use his Direct Express card on his behalf. *See* ECF No. 62-23, McPhail Dep. at 13:6–9; *see also* ECF No. 59-3 at 1081, 1118.

In May 2018, after receiving inpatient treatment at a skilled nursing facility on April 17, McPhail and his family noticed three transfers from his account to a "Green Dot Card" on April 4 and 17, 2018. ECF No. 56-25, McPhail Decl. ¶¶ 4–5. All three transactions were funds transfers to Green Dot, a business that provides prepaid cards to customers, for a total amount of $17,000.

*See* ECF No. 59-3 at 937–38. On May 11, 2018, McPhail and his daughter challenged the transactions and were sent a fraud questionnaire, which they completed and returned to Direct Express. ECF No. 56-25, McPhail Decl. ¶¶ 7–8.

On June 25, 2018, Direct Express sent a letter denying McPhail's claim based on a "conflict in the information [he] provided and the information resulting from Direct Express's research." *Id.* ¶ 9. When McPhail's daughter called Direct Express to request the documents supporting the denial, she learned that the claim had been denied because the same type of Green Dot transfers had occurred in February and March 2018 and had not been disputed. *Id.* ¶¶ 11–12.

Thus, on July 14, 2018, McPhail filed another fraud claim with Defendants for the transfers in February and March, totaling $13,000. *See id.* ¶ 13. Direct Express sent another fraud packet, which McPhail and his daughter completed and returned to Direct Express, along with a copy of the police report they had filed. *Id.* ¶¶ 14–15. On August 14, 2018, Direct Express concluded its investigation and informed McPhail that it could not confirm that fraud had occurred and that his claim was being denied. ECF No. 59-3 at 1137. In response to the second denial letter, McPhail and his daughter again requested the documentation supporting the denial. ECF No. 56-25 ¶ 17; *see also* ECF No. 59-3 at 1049–50, 1134. Defendants have failed to provide any such documentation. ECF No. 56-25 ¶ 18.

McPhail alleges that Defendants have failed to provide him with a provisional credit, in violation of 12 C.F.R. § 1005.11, or provide a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶ 139. He further alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See id.* ¶ 140.

### D.  JB Simms

Plaintiff Simms began receiving Social Security benefits at retirement and received them through a Direct Express card until his experiences with unauthorized transactions that gave rise to this dispute. ECF No. 62-20, Simms Dep. at 69:22–70:12.

In January 2017, Simms noticed certain transactions that he believed to be unauthorized. *Id.* at 91:13–92:15. Simms orally reported the first array of these transactions (six total transactions, amounting to $53.80) to Direct Express within two days after they appeared on his account. *See* ECF No. 59-3 at 1682. When Direct Express failed to deliver a fraud questionnaire to provide written confirmation of his claim in a timely manner, Simms mailed a written narrative outlining the fraudulent transactions to Direct Express. ECF No. 56-22 ¶ 6; ECF No. 59-3 at 1682, 1700–02. Simms received a letter dated March 9, 2017, informing him that Direct Express had closed out his claim, without providing a refund because he had not provided further information to substantiate his claim. *See* ECF No. 59-3 at 1698. Simms asserts that, despite his request, Defendants failed to provide him with a copy of the documents supporting their determination that the transactions were not fraudulent. ECF No. 56-22, Simms Decl. ¶ 8. For three of these transactions (totaling $51.54), Simms was able to convince the merchant to refund the charge. *See* ECF No. 62-20, Simms Dep. at 63:15–21; ECF No. 56-22 ¶ 9. The remaining transactions that Simms challenged—unsuccessfully—amounted to $2.26. *See* ECF No. 62-21.

On December 10-11, 2017, Simms disputed five additional transactions totaling $246.97. See ECF No. 59-3 at 1681. He followed up his oral notice of the transactions with written confirmation via fax on December 17. *See id.* at 1721; ECF No. 56-22, Simms Decl. ¶ 12. On December 20, 2017, Direct Express sent a letter approving Simms's claim in part and informing Simms that a credit in the amount of $81.11 had been posted to his account. ECF No. 59-3 at 1722.

On January 2, 2018, Direct Express issued a second letter denying Simms's claim as to the remaining transactions based on a merchant refund on December 29, 2017. ECF No. 59-3 at 1727. Simms again requested a copy of the documents supporting this denial, which Defendants failed to provide. ECF No. 56-22, Simms Decl. ¶ 15. Simms closed his account with Direct Express shortly thereafter. *See* ECF No. 62-20, Simms Dep. at 70:2–12.

After terminating his account, Simms asserts that he has assisted over 150 Direct Express customers in obtaining refunds for challenged transactions, collecting over $350,000 for these customers. ECF No. 62-20, Simms Dep. at 45:23–46:1, 55:4–59:14. Simms maintains social media pages dedicated to assisting customers in obtaining refunds, has posted to other public websites regarding his concerns about the Direct Express program, and independently evaluated many of the claims of unauthorized transactions that he assisted in addressing. *Id.* at 60:23–61:8.

Simms alleges that Defendants have alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See* ECF No. 31 ¶ 165. He further alleges that Defendants failed to provide a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See id.* ¶ 164.

### E.  Jackie Densmore

Plaintiff Densmore is the payee for disability benefits that her brother-in-law receives as a result of his military service. ECF No. 62-18, Densmore Dep. at 82:5–85:1, 95:18–23. On August 3, 2018, Densmore contacted Direct Express to check the account balance and learned through an audio recording that a new debit card was being mailed out, though it did not explain why. ECF No. 56-30, Densmore Decl. ¶¶ 7–8. When the new card failed to appear in the mail after a few days, Densmore tried unsuccessfully for several days to reach Direct Express to ask about the card.

Each time she called the Customer Service number, however, she was met with the same recording informing her that a new card was on the way but did not offer any options to speak to a representative. ECF No. 62-18, Densmore Dep. at 103:17–104:2.

Finally, on August 10, 2018, Densmore reached a Direct Express representative and learned that on August 2, someone had contacted Direct Express claiming to be Densmore and reported that the card had been damaged and asked for a replacement. *Id.* at 105:6–10; ECF No. 56-30, Densmore Decl. ¶¶ 7–8; *see also* ECF No. 59-3 at 685–86 (Direct Express call log). Then, on August 8, someone claiming to be Densmore requested $802.82 be transferred from the account to a MoneyGram card, to be picked up at a Wal-Mart Superstore in Hollywood, Florida. ECF No. 56-30, Densmore Decl. ¶ 5. Defendants allowed this transaction to proceed, even though both Densmore and her brother-in-law live in Massachusetts. *Id.* ¶ 6.

Densmore immediately challenged this transaction, both the amount of the wire transfer and a $12 processing fee. ECF No. 62-18, Densmore Dep. at 107:13–25. After Direct Express failed to send her a fraud packet, Densmore put together a hand-written narrative outlining the transaction and faxed it to Direct Express. *Id.* ¶ 14. On August 16, 2018, the full amount of these transactions was credited back to Densmore's account. ECF No. 62-18, Densmore Dep. at 114:10–14; ECF No. 59-3 at 705. Despite Densmore's explicit requests, Direct Express failed to provide her with the results of the investigation into the fraud on her brother-in-law's account. ECF No. 56-30 ¶ 19.

Densmore alleges that Defendants failed to provide a timely credit, in violation of 12 C.F.R. § 1005.11, and failed to provide her with the results of their investigation in a timely fashion, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶ 111.

**F.   Jennifer Kreegar**

Plaintiff Kreegar has received disability benefits from the Department of Veterans Affairs since the late 1990s. ECF No. 62-3, Kreegar Dep. at 57:19–58:10. She enrolled in the Direct Express program in 2016. *See* ECF No. 59-3 at 766.

On December 31, 2018, Kreegar received a postcard, mailed on December 27, 2018, indicating that the address associated with her debit card had been updated on December 6. ECF No. 62-3, Kreegar Dep. at 109:22–110:14. On the same day, she noticed three unauthorized transactions: an expedited mailing fee of $13.50 dated December 26, 2018, and two separate ATM cash withdrawals totaling $1,139.50. *Id.* at 84:5–85:10, 88:13–89:9; *see also* ECF No. 62-8 at 2; ECF No. 62-9. These ATM transactions took place in Jonesboro, Georgia even though Kreegar lived in Middletown, Indiana. *See* ECF No. 62-3, Kreegar Dep. at 11:2–8; 85:2–10.

Kreegar eventually learned that thieves had been able to change her address by phone and have a new debit card mailed to a location in Georgia. *Id.* at 115:11–13; ECF No. 59-3 at 815–16. After some difficulty getting through to Direct Express—because she did not have access to the "new" address in Georgia or the new card information—Kreegar was able to report the unauthorized transactions on December 31, 2018. *See* ECF No. 62-3, Kreegar Dep. at 91:5–92:13, 94:3–25, 110:6–12; ECF No. 59-3 at 816. On January 4, 2019, Direct Express informed Kreegar that it had completed its investigation of these transactions and provided a complete credit as to all of the challenged transactions.[3] *See* ECF No. 62-3, Kreegar Dep. at 91:5–92:13, 94:3–25. Kreegar alleges that Defendants failed to timely credit her account, in violation of 12 C.F.R. § 1005.11.

---

[3] Defendants motion for summary judgment incorrectly submits that the expedited mailing fee was found not to be fraudulent. ECF No. 62 at 11 n.1. It appears that this expedited mailing fee was charged to Kreegar's account when the individuals who stole her identity ordered the replacement card that was sent to Georgia. ECF No. 59-3 at 812–13, 816. This charge was recredited to her account on January 4, along with the ATM withdrawals. *See id.* at 813. Nonetheless, Conduent did charge Kreegar a $4.00 replacement fee and a $13.50 expedited mailing fee for the new card issued to her after the fraud on her account. *See id.*; ECF No. 62-3, Kreegar Dep. at 96:22–25.

### G.  Kenneth Tillman

Plaintiff Tillman previously received monthly social security disability benefits through a Direct Express debit card. ECF No. 56-32, Tillman Decl. ¶ 3. On August 1, 2018, while attempting to withdraw cash at a supermarket in Colorado, his card was declined for insufficient funds. *Id.* ¶6. After several hours of trying to reach someone at Conduent by phone, with the help of his therapist, he finally got through to a Direct Express Customer Service representative. *Id.* ¶ 7; *see also* ECF No. 59-3 at 1943 (Direct Express calls notes dated August 1, 2018). The Direct Express representative identified two unauthorized transactions at stores in California totaling over $700 on Tillman's Direct Express account, and informed Tillman that someone was, at the time of the call, attempting to make a purchase with his card. ECF No. 56-32, Tillman Decl. ¶ 8; *see also* ECF No. 59-3 at 1943; ECF No. 62-1, Tillman Dep. at 46:16–47:3, 50:18–51:5, 116:12–22. The representative further acknowledged that the disputed transactions were fraudulent, given that Tillman was in Colorado at the time, ECF No. 56-32, Tillman Decl. ¶ 3, but informed Tillman that he would have to wait for the charges to close before he could dispute them. ECF No. 59-3 at 1943.

After taking steps to cancel Tillman's card, the representative directed him to contact the Direct Express Fraud Services Department once the transactions closed to report the earlier unauthorized transactions. ECF No. 62-1, Tillman Dep. at 113:5–114:11; ECF No. 59-3 at 1943. On Monday, August 6, Tillman called the Fraud Services Department. *Id*. at 114:9–11. Following this phone call, Direct Express sent Tillman a "fraud packet" to assist in substantiating his claims, which he promptly completed and returned to Direct Express. *Id*. at 117:15–20, 123:8–124:4.

The Direct Express Fraud Services Department responded to Tillman's claim in a letter dated August 20, 2018, that Direct Express had posted a credit to Tillman's card to cover the entire

amount of the challenged transactions. *See* ECF No. 62-5; *see also* ECF No. 62-6. Conduent's records indicate that the credit adjustment occurred on August 20. ECF No. 59-3 at 1905.

Tillman testified that, as a result of his money being stolen, he had a breakdown and had to go see his therapist and enlist her to help him pursue getting his stolen benefits back. *See* ECF No. 66-4, Tillman Dep. at 38:17–25. Tillman further testified that he could not get his medication, could not pay his phone bill, and could not pay his rent, resulting in nightmares and lack of sleep while he "went through hell for three weeks" trying to get his money back. *Id.* at 57:24–58:19.

Tillman alleges that Defendants refused to provide him with a provisional credit, in violation of 12 C.F.R. § 1005.11, and failed to provide him with the results of their purported investigation in a timely fashion. ECF No. 31 ¶ 181.

### H. Cynthia Clark

Plaintiff Clark is the caretaker for her adult son, who receives disability benefits through the Direct Express program. ECF No. 62-7, Clark Dep. at 13:1–9, 57:1–58:22. On November 2, 2018, after receiving an email alert from Defendants informing her that her son's Direct Express account balance was below $100, Clark contacted Direct Express and requested information regarding the balance on this card. *Id*. at 32:17–33:4, 84:4–15; *see* ECF No. 59-3 at 424 (Direct Express call log). A Direct Express representative informed her of pending transactions that she did not recognize. ECF No. 62-7, Clark Dep. at 33:5–10. After the transactions closed, on November 4, 2018, Clark called Customer Service again and requested to close her account, referencing the earlier unauthorized charges and additional fraudulent transactions that posted after her first call, including a purchase at a Best Buy in Minnesota, even though Clark lived in Georgia. *Id*. at 95:17–97:21; ECF No. 56-29, Clark Decl. ¶¶ 4–7; *see* ECF No. 59-3 at 424. On November 14, 2018, Clark called Customer Service again and was transferred the Fraud Department to

dispute the unauthorized charges, totaling $1,509.47. ECF No. 62-7, Clark Dep. at 94:23 – 95:12, 98:23–99:24; ECF No. 59-3 at 12–13, 17, 24. Direct Express sent her a fraud packet, which she completed and returned. *See* ECF No. 59-3 at 434–44.

On November 28, 2018, Direct Express sent two letters to Clark. In the first, Direct Express informed her that based on the results of an investigation, Direct Express had posted a credit to her son's account in the amount of $985.73, resolving her fraud claims with respect to four of the transactions she reported. *See* ECF No. 59-3 at 450. The second letter informed Clark that Direct Express had issued a provisional credit to her account in the amount of $523.74 while Direct Express continued the investigation into her remaining claims. *Id*. at 451. After completing the investigation, Direct Express made those provisional credits permanent. *Id.* at 454–55.

Clark described the frustration associated with having hundreds of dollars stolen from her disabled son's account, the sleepless nights she spent investigating the theft prior to the money being credited back, the time spent filing police reports and calling the vendors in hopes of getting her money back, and the money she had to loan her son so his bills could be paid in the interim. *See* ECF No. 66-1, Clark Dep. at 31:16–34:5; 44:14–47:16.

Clark alleges that Defendants refused to provide her a provisional credit 12 C.F.R. § 1005.11, and failed to provide her with the results of their purported investigation in a timely fashion. ECF No. 31 ¶ 98.

### III.  Procedural History

This case is a continuation of an action originally filed on February 12, 2019, in the United States District Court for the Northern District of Georgia. Plaintiffs first filed their claims in that court, asserting the same factual allegations and seeking the same relief on behalf of the same putative class. *Almon v. Conduent Business Services, LLC*, No. 1:19-cv-00746-LMM (N.D. Ga.

Feb. 12, 2019). In that case, Judge May granted Defendants' motion to dismiss the non-Georgia Plaintiffs' individual claims due to lack of personal jurisdiction and, on the merits, dismissed Plaintiffs' data breach claims. *See Almon*, ECF No. 29 at 13–14, 19–24.

The non-Georgia Plaintiffs promptly renewed their claims against Defendants by filing this action on September 5, 2019. *See* ECF No. 1. At a hearing on Defendants' motion to dismiss on January 9, 2020, the Court denied dismissal as to all counts, but advised the Plaintiffs to consider narrowing and refining their claims in order to streamline the proceedings. *See* ECF No. 30; Text Order (Jan. 13, 2020).

On January 20, 2020, Plaintiffs filed their Amended Class Action Complaint, the operative pleading. *See* ECF No. 31. In addition to removing several statutory claims and one named Plaintiff, the Amended Complaint consolidated what remained of the Georgia case into this action. Rather than pursue similar claims in two actions in two courts, the parties agreed it would be more efficient to pursue all claims in one case. *Id.* ¶ 22. Because they both maintain their principal places of business in Texas, jurisdiction over Defendants is undisputed in Texas, regardless of Plaintiffs' state of citizenship. Accordingly, the Amended Complaint joined the Georgia Plaintiffs in this action. *See* ECF No. 31 ¶ 21. In return, Defendants have agreed that the statute of limitations for all claims of the Georgia Plaintiffs and all class claims by all Plaintiffs will be based on the initial filing date of the Georgia case. *See id.*

The Amended Complaint alleges a claim for breach of contract and the covenant of good faith and fair dealing and a claim for violations of the EFTA and Regulation E. *Id.* ¶¶ 206–26 (Counts 1 and 2). The Amended Complaint also asserts claims for negligence, negligence per se, and violations of the California Consumer Protection laws and identifies a class based on the alleged data breach affecting the Direct Express Program. *Id.* ¶¶ 227–61 (Counts 3, 4, and 5).

On July 20, 2021, Plaintiffs moved for class certification as to their claims for breach of contract and for violations of the EFTA. *See* ECF No. 56. They seek certification of the following proposed nationwide classes:

> All Direct Express customers who, within the applicable statute of limitations period preceding the filing of this action and through the date of class certification, were denied a refund in violation of Defendants' Terms of Use (the "Breach of Contract Class"); and

> All Direct Express customers who, within the applicable statute of limitations period preceding the filing of this action through the date of class certification, were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations (the "Regulation E Class").

*Id.* at 6. For the Regulation E Class, Plaintiffs propose a Class Period from February 12, 2018, one year before this suit was originally filed in the Northern District of Georgia, through the date of class certification. *Id.* Plaintiffs also move to be appointed Class representatives and for the appointment of their counsel as Class Counsel. *Id.*

While briefing on the motion for class certification was ongoing, Defendants filed a motion for summary judgment. *See* ECF No. 62. Defendants assert that Plaintiffs claims for breach of contract and violations of the EFTA fail as a matter of law because, in the few instances where the challenged transactions were not fully refunded, Defendants' investigation and resolution of the claims complied with the requirements of the EFTA and the Terms of Use. *Id.* at 5–6. Defendants emphasize that "[t]he statute, and the Terms of Use that constitute the contract between Plaintiffs and Defendants, requires certain *procedural* protections, not the substantive result of a refund, and certainly not simply because Plaintiffs request that refund." *Id.* Because the resolution of a dispositive motion may cause the motion for class certification to become moot, the Court will address the motion for summary judgment before proceeding to the class certification analysis.[4]

---

[4] Federal Rule of Civil Procedure 23 provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." FED.

## DISCUSSION

### I.   Motion for Summary Judgment

#### A.   Summary Judgment Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine'

---

R. CIV. P. 23(b)(1)(A). "As a general matter, however, Rule 23 permits a district court, in appropriate circumstances, to defer the issue of class certification until after disposing of summary judgment motions." *Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825, 837–38 (1st Cir. 2015); *see, e.g.*, *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 406 (5th Cir. 2011) ("Because [the defendant's] Motions for Summary Judgment are potentially dispositive of this dispute, the Court address those Motions first, [before the plaintiffs' motion for class certification].""); *Hoge v. Parkway Chevrolet, Inc.*, No. CIV.A. H-05-2686, 2007 WL 3125298, at *16 (S.D. Tex. Oct. 23, 2007) ("A suit pleaded as a class action may be resolved by deciding a motion to dismiss or for summary judgment, even before class certification is decided.").

issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## B.   Article III Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST., Art. III, § 2. The doctrine of standing gives meaning to these constitutional limits by ensuring that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497 (2007) (quoting *Baker v. Carr*, 369 U.S. 186 (1962)) (internal quotation marks omitted). Even a plaintiff who seeks to represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) (citing *Simon v. E. Ky. Welfare Rts.*

*Org.*, 426 U.S. 26, 40 n.20 (1976)) (internal quotation marks omitted). Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The constitutional minimum for standing requires three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, plaintiffs must have suffered an injury in fact – an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* "Second, there must be a causal connection between the injury and the conduct complained of . . .." *Id.* Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.

The elements of standing "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* On summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" showing an injury resulting from the defendant's conduct, "which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting FED. R. CIV. P. 56(e)).

**C.   Analysis**

**1.   Breach of Contract Claims**

The Terms of Use dictate that Michigan law applies to Plaintiffs' breach of contract claims. ECF No. 31-1at 3. To prevail on a claim for breach of contract in Michigan, a plaintiff must establish by a preponderance of the evidence that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., N.A. v. First Am. Title Ins. Co.*, 499 Mich. 74, 100 (2016).

Defendants assert that Plaintiffs' breach-of-contract claim fails as a matter of law because Plaintiffs have failed to identify a provision that was allegedly violated. ECF No. 62 at 34–35; ECF No. 69 at 4–6. Defendants are correct that the first claim for relief alleged in the Amended Complaint, for "Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing" does not address any specific terms of the Agreement, but simply asserts that "Defendants violated the contract by failing to adhere to the policies and procedures contained in the contract with respect to fraudulent and unauthorized transactions." ECF No. 31 at 32–33. Plaintiffs respond that they have consistently identified Section 8 of the Agreement, "Your Liability for Unauthorized Transactions," as the provision that Defendants breached. Indeed, the Amended Complaint recites excerpts of Section 8 and refers to this provision as being a provision that Defendants breached by failing to limit the losses suffered by Plaintiffs Almon, Carnley, McPhail, and Simms. ECF No. 67 at 7–8 (citing ECF No. 31 at ¶¶ 61, 62, 77, 90, 140, 165). Plaintiffs' motion for class certification likewise cites Defendants' violations of Section 8 of the Terms of Use as the basis for its proposed Breach of Contract class. ECF No. 56 at 5–7. Accordingly, the Court will refer to Section 8 of the Terms of Use in assessing the claims asserted by Almon, Carnley, McPhail and Sims for breach of contract.

Section 8 provides for caps on losses resulting from unauthorized transactions, which vary based on the time in which the customer reports that her card or PIN has been lost or stolen after learning about the loss or theft. If a customer reports the loss or theft by "[t]elephoning [Defendants] at the Customer Service number" within two business days, she "can lose no more than $50 if someone used [her] Card or PIN without [her] permission." ECF No. 31-1 at 2. A customer who fails to report the loss or theft within two business days of learning about it can "lose as much as $500" if Defendants can prove that they could have prevented the unauthorized

22

transactions. *Id.* The cap on losses arising out of these preventable transactions does not apply to residents of California, who "will not be liable for the $500 amount . . . in any event." *Id.* Finally, if a customer fails to report an unauthorized transfer of funds within 90 days after the transaction history showing such transfer is made available to her, she may not get any money back at all, so long as Defendants can prove that they could have stopped someone from taking the money if the transfer had been reported in time. *Id.* Plaintiffs assert that "[a]pplying this language to the claims of Plaintiffs Almon, Carnley, McPhail, and Simms, their liabilities should have been capped at $50 for the unauthorized transactions they reported on their cards." ECF No. 69 at 13.

In their motion for summary judgment, Defendants contend that Plaintiffs' claims for breach of Section 8 of the Agreement fail as a matter of law because Plaintiffs received refunds for most of the challenged transactions. ECF No. 62 at 20–24. Plaintiffs respond that four of the named Plaintiffs—Almon, Carnley, McPhail, and Simms—were not fully refunded. ECF No. 67 at 9–12. In reply, Defendants argue that Section 8's limitation on liability is inapplicable because (1) Plaintiffs failed to allege that the unauthorized transactions were the result of a "lost or stolen card or PIN" and (2) Section 8 only limits losses with respect to meritorious challenges to "unauthorized transactions," ECF No. 69 at 4 n.3, 5. "Arguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) (alteration marks omitted)). Because the class certification analysis for the proposed Breach of Contract Class will depend on the construction of the Terms of Use, the Court will address Defendants' arguments in reply in the interest of clarity.

(a)  *The effect of refunds on Plaintiffs' "losses"*

While many of the challenged transactions were refunded, Plaintiffs correctly note that Almon, Carnley, McPhail, and Simms were ultimately denied refunds as to certain transactions.

ECF No. 67 at 9–12. Almon initially received $793.78 in provisional credits for the unauthorized transactions he reported, but these credits were reversed after Defendants concluded that the allegations of fraud could not be confirmed. *See* ECF No. 59-3 at 38–45. His account now shows a negative balance of $793.78, which he owes Defendants. *See* ECF No. 62-17. In addition to Almon's losses, Carnley suffered a total loss of $247.76, *see* ECF No. 59-3 at 332; McPhail lost a total of $30,000, *see id.* at 1090–92, 1109–11; and Simms lost a total of $2.26, after reimbursements from both Direct Express and various merchants, *see* ECF No. 62-21.

Defendants argue that Almon cannot maintain a claim for breach of contract, asserting that he has not suffered a loss considering the provisional credits he received and spent before closing his account. ECF No. 62 at 20–23 (citing *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 202 (Mich. Ct. App. 2017) ("Without an actual injury resulting from a breach of contract, the trial court properly dismissed plaintiff's breach-of-contract claim as not ripe for adjudication.")); *see also* ECF No. 69 at 4–6. But Michigan law recognizes liability to repay a defendant as sufficient injury in a claim for breach of contract. *See Lear Corp. v. LH Trucking, Inc.*, No. 05-74477, 2008 WL 2610239, at *2 (E.D. Mich. July 1, 2008) (granting the plaintiff's motion for summary judgment on its breach-of-contract claim against the defendant for overcharging for trucking services, even where the plaintiff owed approximately $700,000 in unpaid invoices). Moreover, the decrease in the value of Almon's account when his credit was reversed is consistent with the ordinary meaning of the word "loss." *See Loss*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/loss ("decrease in amount, magnitude, value, or degree") (last visited Mar. 21, 2022). Almon's obligation to pay this amount is a sufficient injury arising out of Defendants' alleged breach of contract.

Defendants also argue that Simms did not incur a sufficient lost to trigger Section 8's limitation on liability. While Direct Express denied claims by Simms amounting to more than $50, those claims were denied because Simms had already been reimbursed by the merchants and therefor did not result in a loss to Simms. *See* ECF No. 62-20, Simms Dep. at 63:15–21; ECF No. 59-3 at 1722, 1727. Simms's net loss of $2.26 does not exceed the minimum $50-cap on losses set forth in Section 8. Thus, regardless of the circumstances under which Simms incurred the loss, it cannot serve as the basis for a claim that Defendants breached Section 8 of the Agreement. Accordingly, Simms's claim for breach of contract fails as a matter of law.

Whether and how Section 8 applies to the surviving claims by Almon, Carnley, and McPhail will depend on the Court's interpretation of the provision and the summary judgment evidence concerning the reporting and investigation of the allegedly fraudulent transactions.

(b)   *The meaning of "lost or stolen card or PIN"*

Defendants argue that Section 8 applies only where a customer's losses were the "result of a lost or stolen card or PIN," and that Plaintiffs have failed to establish that they experienced a lost or stolen card or PIN. ECF No. 69 at 4–5. Defendants insist that Plaintiffs "claim only that they experienced allegedly unauthorized transactions, not that those transactions were as a result of a lost or stolen card or PIN." *Id.* at 5 (citing ECF No. 31 ¶¶ 66–72 (Almon); ¶¶ 79–82, 88 (Carnley); ¶¶ 123–125, 132 (McPhail)). "Indeed," Defendants urges, "McPhail even admits that his card was at all times in the possession of individuals with authority to use that card." *Id.* (citing ECF No. 60-24, McPhail Dep. at 13:5–14).

The Court is unpersuaded by Defendants' narrow construction of the phrase "lost or stolen card or PIN." "The language of a contract is to be given its ordinary, plain meaning." *Vill. of Edmore v. Crystal Automation Sys., Inc.*, 911 N.W.2d 241, 251 (Mich. Ct. App. 2017). Even if

Plaintiffs' debit cards were not *physically* lost or stolen, their claims arising out of "unauthorized transactions" fall squarely within the ambit of Section 8 because the "unauthorized" nature of the transactions indicates that their debit card numbers or PINs were used without permission, or "stolen." This interpretation of the phrase "stolen" comports with the ordinary, plain meaning of the word. *See Steal*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/steal ("to take or *appropriate without right or leave* and with intent to keep or *make use of wrongfully*") (emphasis added) (last visited Mar. 18, 2022).

Rather than restricting recovery for "unauthorized transactions" to circumstances in which a customer has physically lost a debit card, the Terms of Use recognize that debit cards and PINs can be "stolen," even if they are not "lost." Indeed, the Terms of Use define "Card" as including *both* the physical card issued to a customer *and* the card number associated with it. *See* ECF No. 31-1 at 2 (defining "Card" as "[t]he Direct Express® Debit Mastercard Card *or* its card number issued by Comerica Bank that is used to access funds in your Card Account." (emphasis added)). This definition recognizes that the card number can be used for transactions even without access to the physical card. The scope of the definition is apparent in Section 7, which provides:

> You agree not to give or otherwise make your Card or PIN available to others. If you do, you will be responsible for any Transactions they conduct, even if they exceed your authorization.

*Id.* Relying on Defendants' narrow definition of "Card" would allow customers to recover for transactions by others who had been given card *numbers* but not the physical cards themselves. A mother who read her card aloud to her son to make an online purchase, for example, would not, under the Defendants' definition, be making the Card itself available to him. Defendants would presumably not accept this purely physical characterization of the Card in this context—nor should they. As a practical matter, a debit card number can clearly be used without access to the physical

card. Similarly, it is unclear to the Court what it means for a PIN to be *physically* "lost or stolen," since a PIN exists independent of any physical location where it happens to be stored. Plaintiffs' allegations of "unauthorized transactions" are sufficient to invoke Section 8 of the Terms of Use.

### (c)   *The meaning of "unauthorized transaction"*

Defendants contend that Plaintiffs' claim for breach of contract fails because it "depends on their contention that Section 8 guarantees . . . a refund upon *any* challenged transaction, regardless of the merit to such a challenge." ECF No. 69 at 4 n.3 (emphasis added). Plaintiffs' summary judgment and class certification briefing does appear to assume that *all* reports of fraud are subject to the caps on liability. They insist that Defendants routinely fail to apply these limits, "[e]ven though the Terms of Use explicitly state that if you contact Conduent within two business days you can lose no more than $50, and that you can lose no more than $500 if you do not report the issue within two business days." ECF No. 56 at 6. The language of Section 8 is clear, however, that these limitations on liability apply only "if someone used your Card or PIN without your permission." ECF No. 31-1 at 2. If the parties wanted to impose these caps on *all* reported losses, they could have done so, by, *e.g.*, applying the limits "if **you report that** someone used your Card or PIN without your permission." Alternatively, they could have included language in Section 8 clarifying that it applied "if someone used your Card or PIN **with or** without your permission."

While the Court cannot endorse Plaintiffs' interpretation of Section 8, this is not fatal to their claims for breach of contract. To be sure, Defendants are not liable for breach of contract for merely denying a claim that exceeds the limits set out in Section 8. But their denial of the claim does not immunize them from liability either. In other words, if the parties had wanted to apply the caps on liability to claims of fraud that Defendants had approved, they could have done so. For

example, the Terms of Use could have limited the cardholder's loss to $50 or $500, as applicable, "if **we determine that** someone used your Card or PIN without your permission."

Because Section 8 does not include any of these phrases narrowing or broadening the circumstances to which it applies, the Court concludes that whether it applies depends on whether the Card or PIN was *actually* used with the cardholder's permission. This understanding of Section 8 is consistent with 15 U.S.C. § 1693g, which imposes the same limits on a consumer's liability for unauthorized transactions. Subsection (b) provides that:

> In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized, or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability [for untimely notice] have been met . . .

15 U.S.C. § 1693g(b). Whether the reported loss was the result of an unauthorized use is a question of fact. Likewise, whether the $50 or $500 cap applied will depend on when the cardholder learned about the unauthorized transaction, when the cardholder reported the alleged fraud, and whether Defendants can prove that the loss could have been avoided if the cardholder had reported it earlier. *See* ECF No. 31-1 at 2.

Although Defendants have generally described the basis for denying the claims reported by Almon, Carnley, and McPhail, they have not moved for summary judgment on the basis that there are no fact issues as to whether the challenged transactions were authorized. *See generally* ECF No. 62. Any such motion would be likely to fail because it would require the Court to "make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' claims for breach of contract is denied with respect to Plaintiffs Carnley, Almon, and McPhail, and granted as to all other named Plaintiffs, including Simms.

### 2.    Claims for Violations of EFTA/Regulation E

The EFTA's primary civil liability provision, 15 U.S.C. § 1693m(a), states that "any person who fails to comply with any provision of [the EFTA] with respect to any consumer . . . is liable to such consumer." 15 U.S.C. § 1693m(a); *Bisbey v. D.C. Nat. Bank.*, 793 F.2d 315, 317 (D.C. Cir. 1986) (emphasis in original) ("civil liability attaches to all failures of compliance with respect to any provision of the [EFTA]"); *Aikens v. Portfolio Recovery Assocs.*, LLC, 716 F. App'x 37, 39 (2d Cir. 2017) (same). Plaintiffs characterize their claims under EFTA (and its enforcement mechanism, Regulation E) as falling into two different categories:

> The first category is claims relating to 12 C.F.R. § 1005.11(c), which deals with Defendants' obligation to immediately investigate and make determinations within 10, 45, or 90 days depending on the circumstances. Where investigations cannot be completed within 10 days, a provisional credit must be given to the cardholder. *See* 12 C.F.R. § 1005.11(c)(2)(i).

> The second category is claims relating to 15 U.S.C. § 1693f(d), which requires Defendants to provide cardholders with a copy of their investigation materials once a determination is made regarding an alleged unauthorized transaction.

*See* ECF No. 67 at 13.

As to the first category, Defendants argue that Plaintiffs who ultimately received a full refund have not suffered cognizable injury under recent Supreme Court precedent, and thus do not have standing to bring claims under the EFTA and Regulation E. ECF No. 62 at 24 n.2. They further attack the factual bases for Plaintiffs' claims relating to the timing of credits to their accounts based on the summary judgment record. With respect to the second category, Defendants maintain that "[t]here is no basis to allow [those claims] to proceed to a jury" because Plaintiffs have been provided with all of the investigative materials during the discovery process. ECF No. 69 at 11.

(a) _Standing under the EFTA_

Defendants assert that Plaintiffs who were ultimately "made whole" by credits to their accounts in the full amount of their disputed transactions do not have standing to challenge the timeliness of their credits under the EFTA. ECF No. 62 at 24. But our laws plainly recognize that payment today is not the same as payment tomorrow. *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). This first principle of economics, known as the "time value of money," is certainly not unknown to large financial institutions such as Comerica and Conduent. Indeed, their livelihood depends to a large degree on the common measure of the difference between payment now and payment later—interest. *Gore, Inc. v. Glickman*, 137 F.3d 863, 868 (5th Cir. 1998) ("interest . . . compensate[s] one for the time value of money.").

In drafting the EFTA, Congress was not blind to the time value of money either. The error resolution provisions of the EFTA explicitly contemplate awards of interest, including in the context of permanent and provisional credits:

> (b) If the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error, . . . **including the crediting of interest where applicable**.

> (c) If a financial institution receives notice of an error, [and cannot complete the investigation within ten business days, it may], within ten business days after receiving such notice[,] provisionally recredit the consumer's account for the amount alleged to be in error, . . . **including interest where applicable**, pending the conclusion of its investigation and its determination of whether an error has occurred.

15 U.S.C.A. § 1693f(b), (c) (emphasis added).

That Defendants do not appear to even consider the possibility that their customers can suffer a "concrete and particularized harm" from the untimely payment of credits—perhaps because the harm, to Defendants, appears minute—speaks to the core purposes of both consumer

protection statutes such as the EFTA and the class action mechanism. Plaintiffs have standing to assert claims as to the timeliness of their credits under Regulation E.

Plaintiffs' right under Section 1693f(d) to receive a copy of the investigative materials supporting the denial of their claims under is analogous to informational injuries previously recognized by the Supreme Court and the substantive rights to disclosures that courts have recognized under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692. *See, e.g.*, *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, No. 1:19-CV-724-RP, 2021 WL 3639801, at *3 (W.D. Tex. Aug. 17, 2021) (citing *Guerrero v. GC Servs. Ltd. P'ship*, No. CV157449DRHAKT, 2017 WL 1133358, at *10–11 (E.D.N.Y. Mar. 23, 2017) (collecting cases)).

Although the Supreme Court has not addressed standing under the EFTA or Regulation E, it recently addressed standing under the Fair Credit Reporting Act ("FCRA") in *Spokeo*, observing that "a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it. Article III standing requires a concrete injury even in the context of a statutory violation." 578 U.S. at 341. That said, an injury need not be "tangible" in order to be "concrete." *Id.* at 340 (quotation omitted). An intangible injury may constitute injury in fact. *Id.* The Court noted that even the risk of real harm might satisfy concreteness. *Id.* (citations omitted).

The Court further observed that in cases in which "harms may be difficult to prove or measure[,]" *id.* at 341–42 (citing Restatement (First) of Torts §§ 569 (libel), 570 (slander per se) (1938)), "the violation of a procedural right granted by statute can be sufficient . . . [and] a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified," *id.* at 342 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient

injury in fact to satisfy Article III); *Public Citizen v. Dep't of Just.*, 491 U.S. 440, 449 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue")); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–374 (1982) (deprivation of information about housing availability constitutes "specific injury" permitting standing). Thus, a plaintiff may suffer "a concrete informational injury where [she or] he is denied access to information required to be disclosed by statute, and [she or] he 'suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). In such a situation, a procedural injury can become constitutionally cognizable when "a person lack[s] access to information to which [she or] he is legally entitled and . . . the denial of that information creates a 'real' harm with an adverse effect." *Id.* at 345.

In *Akins*, the Supreme Court concluded that a group of voters' "inability to obtain information" that Congress had decided to make public was a cognizable injury because such information was related to and protective of their voting rights. 524 U.S. at 21. The information "would help them (and others to whom they would communicate it) to evaluate candidates for public office . . . and to evaluate the role that [a specific political action committee]'s financial assistance might play in a specific election." *Id.* The voters' standing in *Akins* did not depend on the success of their preferred candidates in an upcoming election. Likewise, the Court held in *Havens* that a "tester" had a legal right to truthful information about available housing, even where he approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home. 455 U.S. at 374.

32

In both *Akins* and *Havens*, the Court was concerned with the right to access certain information protective of individual rights rather than whether and how that information was actually used. The Court's standing analysis in *TranUnion LLC v. Ramirez*, on the other hand, centered on the use of the information in question. 141 S. Ct. 2190, 2200 (2021). This is because, like *Spokeo*, *Ramirez* involved the FCRA, which, as the word "reporting" suggests, is concerned with a particular kind of injury: the dissemination of credit reports containing misleading information to third-parties. *Ramirez*, 141 S. Ct. at 2210. ("The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."). There, certain class members were found to lack standing under the FCRA because misleading information in their internal credit files was never provided to credit agencies or even to the class members themselves. *Id.* at 2209–12 ("[P]laintiffs did not present any evidence that the 6,332 class members even knew that there were OFAC alerts in their internal TransUnion credit files."). Indeed, *Ramirez* specifically rejected the kind of informational injury alleged here because "[t]he plaintiffs did not allege that they failed to receive any information" or demonstrate that "the alleged information deficit hindered their ability to correct erroneous information before it was sent to third parties." *Id.* at 2214.

In this case, the information Plaintiffs requested is protective of substantive rights afforded under the EFTA in at least two respects. First, the investigative materials are the only evidence that the good-faith investigation mandated by the EFTA actually occurred. In her order on Defendants' motion to dismiss the Georgia action, for example, Judge May concluded that Defendants' failure to supply Almon with the documents upon which they relied in determining that no error occurred was sufficient to support his claim that Defendants had failed to conduct a good faith investigation. *See Almon v. Conduent Bus. Servs., LLC*, No. 1:19-cv-00746-LMM, ECF

No. 29 at 17–18 (N.D. Ga. Aug. 9, 2019). Second, Regulation E provides that a financial institution that has complied with the error resolution requirements has no further responsibilities should the consumer later reassert the same error, *except* in the case of an error asserted after the consumer receives "additional information or clarification . . ., including a request the consumer makes to determine whether an error exists. 12 C.F.R. § 1005.11(e). In other words, unlike the FCRA plaintiffs in *Ramirez*, a customer's right to challenge or correct a financial institution's resolution of an error directly affecting her financial interests depends in part on access to documents supporting its determination. Accordingly, the Court is satisfied that the information injury caused by Defendants' failure to produce the investigative documents as required under 15 U.S.C. § 1693f(d) is sufficiently concrete to establish standing to sue under the EFTA.

Even if Plaintiffs were required to show an injury beyond these violations of the EFTA and Regulation E, they have adequately alleged the emotional distress that other courts have found to be sufficient in the context of statutory violations. *See Perez*, 2021 WL 3639801, at *3 (plaintiff's confusion resulting from a misleading debt collection letter was a sufficient injury under the FDCPA); *Smith v. Moss L. Firm, P.C.*, No. 3:18-CV-2449-D, 2020 WL 584617, at *5 (N.D. Tex. Feb. 6, 2020) (collecting cases in which courts have held that the "anxiety" and "worry" resulting from and FDCPA violations are sufficiently concrete and particularized injuries); *see also Ramirez*, 141 S. Ct. at 2211 (discussing a potential "emotional injury"). Tillman, for example, testified that he "went through hell for three weeks" trying to get his money back even though Direct Express admitted to him during his initial call that they knew it was fraud, but still would not provide him with a provisional credit. *See* ECF No. 66-4, Tillman Dep. at 57:24–58:19; *see also* ECF No. 62-7, Clark Dep. at 31:16–34:5; 44:14–47:16 (describing frustration with Direct Express and sleepless nights spent investigating the theft and time spent filing police reports and

contacting vendors in hopes of getting her money back); ECF No. 62-3, Kreegar Dep. at 49:1–20; 53:14–55:12 (describing the pain and suffering she endured "having to go through everything to try to find somebody to answer and to get my money back.").

Defendants mischaracterize that "confusion" and "anxiety or worry" that many of the named Plaintiffs assert they experienced in their attempts to resolve the fraudulent charges on their accounts as "a concern over the possibility that some actor other than Defendants would unlawfully use Plaintiffs' information and cause some financial injury." ECF No. 69 at 7. This account of the source of Plaintiffs' mental anguish is specious. From Plaintiffs' perspective, by the time Direct Express had begun its investigation, their funds had already been used unlawfully. Indeed, Defendants' puzzling practice of canceling cards but refusing to terminate pending transactions that customers identify as fraudulent *guarantees* that Direct Express customers suffer financial harm. *See, e.g.*, ECF No. 62-2, Almon Dep. at 55:6–56:4; ECF No. 56-29, Clark Decl. ¶ 6. Put differently, Plaintiffs were not worried that they would lose money at the hands of thieves in the future because, pursuant to Defendants' own policies, they had already lost money at the outset of the investigation. Instead, they were worried that they would be unable to recover the money they lost due to Defendants' failure to fulfill their responsibilities under the EFTA and Regulation E, including the obligation to conduct a good faith investigation. As discussed, failure to supply these investigative documents can support a claim that the investigation was deficient. *See Almon*, No. 1:19-cv-00746-LMM, ECF No. 29 at 17–18; *see also* ECF No. 62-18, Densmore Dep. at 134:10–11 ("I have no idea what happened in my investigation."); ECF No. 56-22, Simms Decl. ¶ 8 ("Despite my request, Defendants failed to provide me with a copy of the documents upon which they relied in making their determination that the transactions were not fraudulent, making it necessary for me to investigate the fraud and confer with the merchants.").

Finally, Defendants' assertion that the production of the requested investigative documents over the course of this litigation has rendered Plaintiffs' informational injuries moot is misplaced in at least two respects. ECF No. 69 at 11. First, this position disregards the statutory requirement that the documents be provided "promptly" upon the request of the consumer. 15 U.S.C. § 1693(d). Although the Court is not familiar with the precise timeline of Plaintiffs' requests under the statute and the production of documents during discovery, it is unlikely to qualify as "prompt" by any measure. Second, and more importantly, Plaintiffs have not asserted a claim for injunctive relief requiring the production of these documents. Instead, they have alleged claims for actual and statutory damages, *see* ECF No. 31 ¶¶ 225–26, and the provision of the investigative documents during discovery does not moot these claims. *See Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 530 (5th Cir. 2008) ("[E]ven where a defendant's voluntary acts of compliance are sufficient to moot a citizen's request for injunctive relief, those voluntary acts will not necessarily moot a related claim for civil penalties"). Indeed, the EFTA's provision for statutory damages upon a financial institution's violation of the statute confirms Plaintiffs' standing in this case. *See* 15 U.S.C. § 1693m(a)(2) (providing for an award of damages in an amount not less than $100 nor greater than $1,000 in an individual action); *id.* § 1693f(e) (providing for treble damages); *see also Bisbey*, 793 F.2d at 316–17 (failing to provide required information under the EFTA is actionable, even where a plaintiff suffered no other damages). This Court could provide Plaintiffs with the relief they desire by ordering Defendants to pay the requested statutory damages. Therefore, it is likely that Plaintiffs' injuries would be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560.

(b) _Violations of 12 C.F.R. § 1005.11_

The Court next turns to the merits of Plaintiffs' claims under Regulation E. As discussed, the parties' disputes center on the timing requirements set forth in 15 U.S.C. § 1693f and 12 C.F.R. § 1005.11. Regulation E provides that "oral or written notice" of an error, including an unauthorized transfer, triggers a financial institution's investigative obligations when the notice:

(i)  is received within 60 days after the institution sends the periodic statement . . . on which the alleged error is first reflected;

(ii) enables the institution to identify the consumer's name and account number; and

(iii) indicates why the consumer believes an error exists and includes to the extent possible the type, date, and amount of the error.

12 C.F.R. § 1005.11(b)(1)(i)–(iii). Following oral or written notice of a transfer-related error, the EFTA requires that the financial institution "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a)(3).

Defendants suggest that they are under no obligation to investigate an allegedly unauthorized transaction until a customer reports the error to the Direct Express Fraud Services Department. _See_ ECF No. 69 at 10–11 (noting that certain Plaintiffs had called departments other than the Direct Express Fraud Department). Not so. The EFTA does not mandate that a customer follow a financial institution's individual reporting procedures in order to trigger its duty to investigate an error. The customer needs only to provide timely information that allows the institution to identify the consumer, the affected account number, and the reason to believe that an error exists. 12 C.F.R. § 1005.11(b)(1)(i)–(iii). Moreover, customers who called the Direct Express Customer Service line, as opposed to the Fraud Services Department, were in fact following Direct Express procedures to the letter. Section 9 of the Terms of Use directs customers who think that

an error has occurred in their account to call the Customer Service number with the required notice

information. *See* ECF No. 31-1 at 2 ("You will need to tell us: a. Your name and Card number. b.

Why you believe there is an error, and the dollar amount involved. c. The approximate date when

the error took place."). Sections 7 and 8 of the Terms of Use, which also pertain to unauthorized

transactions, likewise instruct customers to call the Customer Service number. *Id.* Indeed, contact

information for the Direct Express Fraud Services Department does not appear anywhere in the

Terms of Use. *See id.* The Court concludes that a customer's contact with Direct Express Customer

Service concerning an allegedly fraudulent transaction is sufficient to trigger the duty to investigate

under Regulation E.[5]

  If, after investigation, the financial institution determines that an error did occur, the EFTA

requires that it credit the consumer's account, with interest, within "one business after such

determination." 15 U.S.C. § 1693f(b). Conversely, if the financial institution determines that an

error did not occur, "it shall deliver or mail to the consumer an explanation of its findings within

[three] business days after the conclusion of its investigation, and upon request of the consumer

promptly deliver or mail to the consumer reproductions of all documents which the financial

institution relied on to conclude that such error did not occur." 15 U.S.C. § 1693f(d). A financial

institution may also take up to 45 days (instead of the customary 10 business days) to conduct its

error investigation if it "[p]rovisionally credits the consumer's account in the amount of the alleged

error (including interest where applicable) within 10 business days of receiving the error notice."

12 C.F.R. § 1005.11(c)(2)(i).

---

[5] In cases where the challenged transaction was still pending, it appears that Customer Service representatives directed Plaintiffs to call back after the transaction had closed in order to challenge it. *See, e.g.*, ECF No. 62-2, Almon Dep. at 56:21–57:1, 75:2–8. Given Direct Express's refusal or inability to cancel pending fraudulent transactions, a pending unauthorized transaction is, from a notice perspective, no less an error than an unauthorized transaction that has closed.

Courts have recognized that "the language of § 1693f(a) and § 1693f(d) generate some uncertainty concerning the timeline for investigation and notification that financial institutions must follow." *Wilson v. Harris N.A.*, No. 06-cv-584, 2007 WL 2608521, at *5 (N.D. Ill. Sept. 4, 2007). Specifically, "Section 1693f(a) can be read to require that both the investigation and notice of results be completed within ten business days, while § 1693f(d) appears to allow a full ten-day period for the financial institution to investigate the claim, followed by notice to the consumer of its determination 'within three business days after the conclusion of its investigation.'" *Id.* at *4. Regulation E "adopts the more generous schedule," contemplating that a financial may take up to eleven business days to correct an error on a consumer's account and up to thirteen business days to notify the consumer of the results of its investigation. *Id.* In pertinent part, Regulation E provides that: "A financial institution shall investigate promptly and . . . shall determine whether an error occurred within 10 business days of receiving a notice of error. The institution shall report the results to the consumer within three business days after completing its investigation. The institution shall correct the error within one business day after determining that an error occurred." 12 C.F.R. § 1005.11(c)(1).

Plaintiffs contend that, in some cases of "obvious fraud," such as out-of-state transactions, Direct Express customers are entitled to receive an immediate credit under Regulation E. *See* ECF No. 67 at 20 n.9. This argument is based on deposition testimony by Conduent's corporate representative, Shantelle Johnson, that, in instances of "obvious fraud," an investigation can begin and conclude on the day that the customer contacts Direct Express. *See id.* (citing ECF No. 56-6, Johnson Dep. at 41:14–22). Just as an internal procedure requiring customers to call the Fraud Services Department even after they have called the Customer Service number does not toll the ten-day period in which Direct Express must complete an investigation, an internal policy

concerning "obvious fraud" does not truncate the statutory and regulatory deadlines. Regulation E requires financial institutions to correct an error "within one business day after determining that an error occurred." 12 C.F.R. § 1005.11(c)(1). Conduent's general approach to cases of "obvious fraud" does not indicate in any specific case when Conduent actually determined that a transaction was unauthorized. An investigator who does not make an "immediate" determination may very well violate an internal policy concerning "obvious fraud," but a violation of an internal policy does not necessarily constitute a violation of Regulation E. Without evidence that Defendants actually approved a claim for "obvious fraud" on the same day it was reported, the Court cannot conclude that their failure to issue a refund by the next day offends Regulation E.

(i)   *Joe Almon*

Almon called the Direct Express Customer Service on November 21, 2018, to report two transactions, totaling $793.78, that he believed to be unauthorized. ECF No. 62-2, Almon Dep. at 17:1–11; 65:3–21. In a letter dated December 15, 2018, sixteen business days after Almon's call to Customer Service, Direct Express notified Almon that its investigation was complete and that his claim had been denied. *See* ECF No. 62-13. Pursuant to Regulation E, Defendants should have provided this notice within thirteen business days—by December 11, 2018—or issued a provisional credit on the tenth business day, December 6. On these facts, Defendants have not established that Clark's claims for violations of 12 C.F.R. § 1005.11 fail as a matter of law.

(ii)   *Cynthia Clark*

On November 4, 2018, Clark called Customer Service asking to close her account and referencing unauthorized charges—including an out-of-state purchase—totaling $1,509.47. ECF No. 62-7, Clark Dep. at 95:17–97:21; ECF No. 56-29, Clark Decl. ¶¶ 4–7; *see* ECF No. 59-3 at 424. On November 28, 2018, nineteen business days after Clark called the Customer Service

number, Direct Express sent two letters to Clark. In the first, Direct Express informed her that it had posted a credit to her son's account in the amount of $985.73, resolving her fraud claims with respect to four of the transactions she reported. *See* ECF No. 59-3 at 450. The second letter informed Clark that Direct Express had issued a provisional credit to her account in the amount of $523.74, which was eventually made permanent. *Id*. at 451, 454–55. Pursuant to Regulation E, Defendants should have provided these notices within thirteen business days—by November 21, 2018. On these facts, Defendants have not established that Clark's claims for violations of 12 C.F.R. § 1005.11 fail as a matter of law.

*(iii) Jackie Densmore*

On August 10, 2018, Densmore orally notified Direct Express of an unauthorized transaction totaling $814.82 on her brother-in-law's account. ECF No. 62-18, Densmore Dep. at 105:6–10, 107:13–25; *see also* ECF No. 59-3 at 685–86 (Direct Express call log). Defendants allowed this transaction to proceed in Florida, even though both Densmore and her brother-in-law live in Massachusetts. ECF No. 56-30, Densmore Decl.¶¶ 5–6. Four business days later, on August 16, 2018, the full amount of these transactions was credited back to the account. ECF No. 62-18, Densmore Dep. at 114:10–14; ECF No. 59-3 at 705.

Clearly, the investigation into Densmore's claims occurred within the ten-day timeline required under Regulation E. Still, Plaintiffs assert that Densmore was entitled to an immediate refund because this transaction was an instance of "obvious fraud." ECF No. 67 at 20. There is no evidence that Direct Express made its determination on the same day that the fraud was reported, however. Thus, Plaintiffs cannot establish that Defendants' failure to credit Densmore's account on the following business day, August 16, violated Regulation E, and her claim fails as a matter of law.

### (iv)  Jennifer Kreegar

On December 31, 2018, Kreegar orally notified Direct Express of three unauthorized transactions on her account totaling $1,139.50. ECF No. 62-3, Kreegar Dep. at 84:5–85:10, 88:13–89:991:5–92:13, 94:3–25, 110:6–12; *see* ECF No. 62-8 at 2; ECF No. 62-9. Three business days later, on January 4, 2019, Direct Express informed Kreegar that it had completed its investigation of these transactions and provided a complete credit as to all of the challenged transactions. *See* ECF No. 62-3, Kreegar Dep. at 91:5–92:13, 94:3–25.

The investigation into Kreegar's claims occurred within the ten-day timeline required under Regulation E. Nonetheless, Kreegar alleges that Defendants failed to timely credit her account, in violation of 12 C.F.R. § 1005.11, because hers was a case of "obvious fraud." *See* ECF No. 67 at 21. As with Densmore, there is no evidence here that Direct Express made its determination on the same day that Kreegar reported the fraud. Accordingly, Plaintiffs cannot establish that Defendants' failure to credit Kreegar's account on the following business day, January 2, violated Regulation E. Her claim fails as a matter of law.

### (v)  Kenneth Tillman

Direct Express received oral notice of unauthorized activity on Tillman's account on August 1, 2018. *See* ECF No. 59-3 at 1943 (Direct Express calls notes). The Direct Express representative identified two unauthorized transactions at stores in California totaling over $700, and informed Tillman that someone was, at the time of the call, attempting to make a purchase with his card. ECF No. 56-32, Tillman Decl. ¶ 8. In a letter dated August 20, 2018—thirteen business days after receiving oral notice of the error—Direct Express indicated that it had posted a credit to Tillman's account to cover the entire amount of the challenged transactions. *See* ECF No. 62-5; *see also* ECF No. 62-6.

Defendants suggest that this sequence of events complies with the more "generous" timeline in Regulation E, because Direct Express notified Tillman of its determination within thirteen business days, permitting the inference that Direct Express made its determination within ten business days. ECF No. 62 at 27. Such an inference would not excuse Direct Express from liability, however. If Direct Express made its determination on the tenth business day, August 15, it was required under Regulation E to "correct the error" by crediting Tillman's account by the next business day. *See* 12 C.F.R. § 1005.11(c)(1). Conduent's records clearly indicate that the credit adjustment occurred on August 20. ECF No. 59-3 at 1905. Accordingly, Defendants have not established that Tillman's claims for violations of 12 C.F.R. § 1005.11 fail as a matter of law.

(c)   *Violations of 15 U.S.C. § 1693f(d)*

Plaintiffs Almon, McPhail, Simms, Densmore, and Carnley assert claims under 15 U.S.C. § 1693f(d). Section 1693f(d) provides that a financial institution must "upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which [it] relied on to conclude that [the alleged] error did not occur." Defendants' form letter to cardholders denying a claim expressly informs them of their right to request reproductions of the investigation results with the explanation of their findings. *See* ECF No. 57-2 at 2. As discussed above, Plaintiffs' actual receipt of these documents in the course of this litigation does not obviate their claims under section 1693f(d). *See also Bisbey*, 793 F.2d at 316–17 (failing to provide required information under the EFTA is actionable, even where a plaintiff suffered no other damages).

Numerous named Plaintiffs have provided testimony establishing that they requested reproductions of all documents which the financial institution relied on in making a determination on their fraud claims, but that Defendants failed to provide the requested documents. *See, e.g.*, ECF No. 56-24, Almon Decl. ¶¶ 11–12 ("Defendants have failed to provide me with a copy of the

43

documents upon which they relied in making their determination that the transactions were not fraudulent"); ECF No. 56-25, McPhail Decl. ¶¶ 17–18 ("Defendants have failed to provide us with a copy of the documents on which they relied in making their determination to deny my claims"); ECF No. 56-22, Simms Decl. ¶¶ 10, 16 ("Defendants . . .  failed to timely provide me with the results of their purported investigation in violation of Regulation E"); ECF No. 56-30, Densmore Decl. ¶ 19 ("despite my explicit request that they do so, Direct Express failed to provide me with the results of their investigation into the fraud on my brother-in-law's account"); ECF No. 62-19, Carnley Dep. at 190:17–193:7 (describing efforts to request copy of investigative materials).

Defendants do not dispute these claims as to any of the named Plaintiffs other than Almon. *See* ECF No. 61 at 22–30. Almon's claim was subject to two separate denials—once in December 2018, and once in February 2019, when Defendants reversed the provisional credit that they had provided. *See* ECF No. 62-13; ECF No. 62-16 at 3. Plaintiffs submit that a statement in Almon's declaration that he requested the investigative record "[u]pon receipt of the letter" indicates that Almon made the request both times. ECF No. 67 at 23 (citing ECF No. 56-24, Almon Decl. ¶ 12). Neither Almon's declaration nor Conduent's contact log specifically identifies such a request in response to the February 2019 denial, however. Almon's ambiguous reference to "the letter" in his declaration does not create a genuine issue of material fact that he requested documents supporting the February 2019 denial of his claims, especially considering the corroborating evidence of his December 2018 request. *See* ECF No. 59-3 at 10 (Conduent contact log reflecting document request and production of investigative documents). Accordingly, Almon's claim under 15 U.S.C. § 1693f(d) fails as a matter of law.

### 3.   Plaintiffs' Data Breach Claims

The Amended Complaint asserts claims for negligence, negligence per se, and violations of the California Consumer Protection laws and identifies a class based on the alleged data breach affecting the Direct Express Program. ECF No. 31 at 36–44 (Counts 3, 4, and 5). Plaintiffs' motion for class certification, however, does not seek to certify such a class. *See* ECF No. 56 at 6. This is likely because, as Plaintiffs concede in their response to Defendants' motion for summary judgment, discovery has not provided any evidence tying unauthorized activity on their accounts to a data breach involving Defendants. ECF No. 67 at 23.

Because Plaintiffs cannot establish a causal connection between their injuries and the alleged data breach, they lack standing to assert claims arising out of the alleged data breach. *Lujan*, 504 U.S. at 560 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976))). Accordingly, Defendants are entitled to summary judgment with respect to Plaintiffs' claims for negligence, negligence per se, and violations of the California Consumer Protection laws.

In sum, Defendants' motion for summary judgment is granted as to (1) Plaintiff Simms's claim for breach of contract; (2) Plaintiffs Densmore and Kreegar's claims for violation of violations of 12 C.F.R. § 1005.11; (3) Plaintiff Almon's claim for violation of 15 U.S.C. § 1693f(d); and (4) Plaintiffs claims for negligence, negligence per se, and violations of the California Consumer Protection laws. The motion is denied in all other respects.  The Court must now determine whether Plaintiffs' surviving claims for breach of contract and for violations of the EFTA and Regulation E are appropriate for class certification.

## II.   Motion for Class Certification

### A.   Article III Standing

In the Fifth Circuit, "[s]tanding is an inherent prerequisite to the class certification inquiry. *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001). Although certification might be a more straightforward issue, the Court must decide standing first because standing "determines the court's fundamental power even to hear the suit." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (holding that the district court erred by not demanding a showing of standing before certifying a class). As explained above, the Court concludes that named Plaintiffs have established standing to assert to their claims for breach of contract and for violations of the EFTA and Regulation E. The Court need not repeat its analysis here.

### B.   Ascertainability

The Fifth Circuit has interpreted Rule 23 to contain an implied prerequisite of ascertainability, noting that "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (declining to certify a class of "residents of this State active in the peace movement")). A putative class exists "if its members can be ascertained by reference to objective criteria . . . ." *Brown v. Mid-America Apartments, LP*, No. 1:17-CV-307-RP, 2018 WL 3603080, at *10 (W.D. Tex. May 22, 2018). Thus, ascertainability depends on the objectivity of the criteria defining the class, not the degree of specificity of the relevant information or the resources required to attain it.

Defendants' contention that neither the potential members of the Contract Class nor the potential members of the Regulation E Class are easily ascertainable relies on purported

deficiencies in their own records. ECF No. 61 at 13–15. "[E]ven generating a reliable list of cardholders who reported fraud is impossible without a manual review," they insist, because, while most claims are categorized in Seibel—Conduent's customer relationship management software— under the Service Request Type "Fraudulent Transaction Dispute," some are categorized under "Transaction Dispute." *Id.* But, regardless of how much time it takes Defendants to discern from its records which customers reported fraud on their accounts and how their claims were resolved, the relevant questions are not subjective—a customer either reported unauthorized activity or did not; a claim was either refunded or was not; denied claims exceeded the limits set out in the Terms of Use or did not; an investigation concluded in ten business days or it did not. In short, Defendants' objections to ascertainability are unsound, both factually and legally.

Factually, the assertion that Defendants' internal databases do not contain sufficient information to reliably detect violations of Regulation E is unsupported. The contract between Comerica and Conduent contains various requirements that Conduent must honor when administering the Direct Express program, including tracking and reporting compliance with the 10/45/90 Rule. *See* ECF No. 56-5, Raymond Dep. at 38:24–39:11, 39:17–23; ECF No. 56-26 (2017 monthly reports); ECF No. 56-28 (2018 monthly reports). Conduent and Comerica keep detailed records regarding whether Conduent has performed up to the contractual standards. *See* ECF No. 56-15 (Service Level Requirement Score Sheets). At bottom, the notion that Conduent's records are sufficiently detailed to identify violations for the purposes of tracking regulatory compliance but are somehow incapable of identifying the same violations for the purposes of regulatory enforcement strains credulity.

Defendants' objection that ascertaining the putative class members in this case would require a manual review is ultimately a complaint that the process would be resource intensive.

But courts in the Fifth Circuit have held that "a defendant may not avoid certification of a class by arguing their business records are not efficiently organized and maintained." *See, e.g.*, *Cleven v. Mid-Am. Apartment Communities, Inc.*, 328 F.R.D. 452, 467–68 (W.D. Tex. 2018) (citing *In re Monumental Life Ins.*, 365 F.3d 408, 417, 419 (5th Cir. 2004) (data kept in "defendant's normal course of business" sufficient)); *see also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 668 (7th Cir. 2015) ("refusing to certify on this basis effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions"). Even if a manual review is needed to ascertain the members of the class, certification is still permissible if the plaintiff has shown that the class is identifiable by objective criteria. *See, e.g.*, *Cleven*, 328 F.R.D. at 467; *McKeage v. TMBC, LLC*, 847 F.3d 992, 999 (8th Cir. 2017) (affirming ascertainability where court had required counsel "to hire reviewers to manually inspect each" customer file). Based on its review of the record, the Court is satisfied that the proposed classes are ascertainable from the records maintained in Defendants' ordinary course of business.

### C.    Rule 23 Standard

Class certification is governed by Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). The decision to certify is within the broad discretion of the district court, though that discretion must be exercised within the framework of Rule 23. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-01 (1981)). To obtain class certification, a party must first satisfy Rule 23(a)'s four threshold requirements of numerosity, commonality, typicality, and adequacy of representation. *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008). The party must additionally satisfy the requirements of either Rule 23(b)(1), (2), or (3). *Id.* The party seeking certification bears the burden of establishing that the requirements of Rule 23 have been met. *Id.*

48

The Court recognizes that both of the proposed classes are fail-safe classes.[6] "A fail-safe class is a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability." *In re Rodriguez*, 695 F.3d 360, 369–70 (5th Cir. 2012). "[T]he class definition precludes the possibility of an adverse judgment against class members; the class members either win or are not in the class." *Id.* at 370 (internal quotation omitted). Here, the Breach of Contract Class includes Direct Express customers who "were denied a refund in violation of Defendants' Terms of Use." ECF No. 56 at 6. Likewise, the Regulation E Class includes Direct Express customers who "were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations." *Id.*

The Fifth Circuit has rejected a rule against fail-safe classes. *See In re Rodriguez*, 695 F.3d at 369–70. The class members must be "similarly linked by a common complaint," "alleging injury from a particular action." *Id*. at 370 (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 n.1 (5th Cir. 1999)). If that is established, "the fact that the class is defined with reference to an ultimate issue of causation does not prevent certification." *Id.* Still, merely pleading a fail-safe class cannot satisfy Rule 23. *Ituah by McKay v. Austin State Hosp.*, No. A-18-CV-11-RP, 2020 WL 354949, at *7 n.1 (W.D. Tex. Jan. 3, 2020), *report and recommendation adopted*, No. 1:18-CV-11-RP, 2020 WL 343973 (W.D. Tex. Jan. 21, 2020) (citing *Dukes*, 564 U.S. at 350–52 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

---

[6] Defendants also appear to challenge ascertainability on this basis. *See* ECF No. 61 at 8 ("Contrary to Plaintiffs' contentions, determining whether Conduent complied with Regulation E and the Terms of Use in any particular instance is an individualized inquiry that is not susceptible of class-wide proof."). The Court addresses this argument in the context of its analysis of the commonality requirement below. To the extent that Plaintiffs can cure the deficiencies in their class definitions by clarifying the nature of their "common complaint," the revised classes will also satisfy the ascertainability requirement.

### D. Rule 23(a) Threshold Requirements

#### 1. Numerosity

To satisfy the numerosity element, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). No minimum number of plaintiffs is required to maintain a suit as a class action, but generally the numerosity element is met if the potential number of plaintiffs exceeds forty. *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). The number of class members is not the determinative question, as the focus is on "whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) (quoting *Philips v. Joint Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). Accordingly, the court may consider a number of other factors, including the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Zeidman v. Ray McDermott & Co.*, 651 F.2d 1030, 1038–39 (5th Cir. 1981) (noting that common-sense assumptions can support a finding of numerosity).

Given the number of claims of fraud reported in 2017 and 2018 and Conduent's 65% claim-denial rate, Plaintiffs estimate that that there are over 216,000 potential members of the Breach of Contract Class. ECF No. 56 at 14–15. Conduent's Regulation E reports show hundreds of violations per month. *See* ECF No. 56-26; ECF No. 56-28. Defendants do not dispute that numerosity is established. This comports with both the "common-sense assumption" of numerosity in light of the millions of Americans who receive benefits through Direct Express each year and the "geographical dispersion" of the class given that Comerica administers the program for beneficiaries across the United States. The Court finds the numerosity element satisfied with respect to both proposed classes.

### 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The element aims to determine "whether there is a need for combined treatment and a benefit to be derived therefrom." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). The threshold of commonality is not high. *Id.* Rather, the commonality test is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). The interests and claims need not be identical. *Id.* The element "requires only that resolution of the common questions affect all or a substantial number of the class members." *Jenkins*, 782 F.2d at 472; *San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 442 (W.D. Tex. 1999) ("As long as class members are allegedly affected by a defendant's general policy, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied").

As a preliminary matter, many of Defendants' arguments as to commonality (and typicality) simply disregard the fact that Plaintiffs are seeking certification of two distinct classes and that not all of the named Plaintiffs are members of *both* proposed classes. For example, in highlighting the purportedly individualized nature of Plaintiffs' claims, Defendants observe that "five of the eight Plaintiffs received full refunds" and thus cannot be members of the Breach of Contract class because they have "not suffered the same injury" as the proposed class members. ECF No. 61 at 18–19. But those five Plaintiffs do not defeat the commonality of a class to which they do not belong and do not purport to represent. While the commonality analysis can of course draw on differences between the claims of named plaintiffs for the purpose of illustrating an expected divergence of legal or factual questions within the proposed class, the commonality element must ultimately be determined by reference to the proposed class itself.

(a)    *Breach of Contract Class*

With respect to the Breach of Contract Class, Plaintiffs submit that "[t]he big question . . . is whether Defendants breached the form contract by failing to limit the losses to either $50 or $500," and that "[s]uch a uniform contract-based question satisfies commonality." ECF No. 56 at 16 (citing *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 552 (W.D. Tex. 2020)). Defendants respond this "big question" does not satisfy Rule 23(a)(2) because, even if it is common to the proposed class, the question will not generate common answers and will require extensive individualized determinations. *See* ECF No. 61 at 17–19. Defendants emphasize that individual questions permeate the class claims, including how Defendants investigated each report of fraud to determine their veracity and the reasons why Defendants ultimately denied each consumer's claim. *See id.*

The Court is satisfied that there are several issues whose resolution will affect all or a significant number of putative class members with claims arising out of Section of 8 of the Terms of Use. *Stewart*, 669 F.2d at 335. Moreover, this common question arises out of the performance of a form contract common to each member of the proposed class—all of the putative members of the Breach of Contract Class are subject to the provisions of Section 8. The Fifth Circuit has recognized that "cases involving form contracts are often prime candidates for class certification because of the common interpretive questions at stake." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020). The Court's summary judgment analysis of Plaintiffs' breach-of-contract claims clearly establishes that there are interpretative questions at stake that would affect all or most of the class members seeking relief under Section 8. *See supra* Section I.C.1 (addressing meaning of "loss," "lost or stolen Card or PIN," and "unauthorized transaction"). While the Court

agrees individual issues exist as to Defendants' resolution of disputed transactions, they are not fatal to commonality of claims arising under Section 8.

Nonetheless, as defined, the Breach of Contract Class does not limit putative class members to those seeking claims under Section 8 of the Terms of Use. Instead, it includes "[a]ll Direct Express customers who," within the limitations period, "were denied a refund in violation of Defendants' Terms of Use." ECF No. 56 at 6. Refunds are available under the Terms of Use for reasons other than the unauthorized transactions referenced in Section 8. For example, Section 2(B) provides for refunds based on Defendants' failure to stop a preauthorized payment to a merchant after the customer followed specified procedures to cancel the preauthorized payments. *See* ECF No. 31-1 at 2. Such a refund would not implicate the limitations on liability set out in Section 8, which apply only "when someone used your Card or PIN without your permission." *Id.* Because the putative Breach of Contract Class appears to extend to all denied refunds, rather than denied refunds for allegedly unauthorized transactions that exceed the contractual limits on liability, the Court cannot conclude that the resolution of the "big question" will affect all or a significant number of putative members of the Breach of Contract Class. *Stewart*, 669 F.2d at 335.

As such, Plaintiffs have failed to carry their burden to "affirmatively demonstrate" commonality as to the Breach of Contract Class as it is currently defined. *Dukes*, 564 U.S. at 350. Their failure to satisfy their burden as to commonality also establishes their failure to prove typicality or predominance with respect to the Breach of Contract Class. FED. R. CIV. P. 23(a)(3); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

*(b)*   <u>*Regulation E Class*</u>

Plaintiffs argue that the common question as to the Regulation E Class is "whether Defendants adhered to the statutory requirements," ECF No. 56 at 16, and, more specifically, whether they "adhere to the mandates of timely completing their investigation (12 C.F.R. § 1005.11) and providing cardholders with the documents relied upon to make their determination (15 U.S.C. § 1693f(d))." ECF No. 66 at 8–9. Defendants respond that the claim of the proposed Regulation E Class "are fact-intensive and call for the application of at least four separate (and distinct) statutory provisions." ECF No. 61 at 21. Given that Defendants already track compliance with Regulation E, the Court remains unpersuaded that the fact-specific nature of the investigation process defeats commonality as to the Regulation E Class. However, Defendants are correct that, as defined, the scope of the class is too broad to allow the Court to identify an issue whose resolution will affect all or a significant number of the putative class members.

The motion for class certification defines the proposed "Regulation E Class" as "[a]ll Direct Express customers who," within the limitations period, "were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations." ECF No. 56 at 6. Here, "the proposed class's common proffered issues 'stretch[] the notions of commonality' by attempting to aggregate several . . . claims of systemic or widespread conduct into one 'super-claim.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 844 (5th Cir. 2012) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)). Indeed, Defendants note that, according to Plaintiffs' characterization, the proposed class comprises claims for violations of multiple statutory provisions based on Defendants' failure to comply with the 10-day investigation deadline (15 U.S.C. § 1693f(a)(3)), failure to provide provisional credits (15 U.S.C. § 1693f(c)), and failure to provide a copy of the investigation documents upon request (15 U.S.C. § 1693f(d)). *See* ECF No. 61 at 20.

54

There do appear to be some questions whose resolution would affect all or a significant number of the putative class members alleging claims based on the timeliness of their investigation and credits under Regulation E. For example, there appears to be some disagreement about how to determine when the ten-day investigation timeline begins and how to determine when an investigation has concluded. *See supra* Section I.C.2 (discussing sufficiency of "oral notice" of an error under Regulation E and cases of "obvious fraud"). However, these questions would not affect putative class members asserting claims arising out of Defendants' failure to provide investigative documents upon request.

Indeed, it is not clear to the Court how Plaintiffs' claims for violations of Section 1693f(d) even fall within the scope of the proposed Regulation E Class. As defined, the Regulation E Class includes Direct Express customers who "were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations." ECF No. 56 at 6. But a financial institution's failure to produce investigative documents upon request violates Section 1693f(d) regardless of whether the underlying denial of the customer's claim violated another provision of the EFTA or Regulation E. In other words, the denial of a refund is distinct from the provision of documents supporting that denial.

Plaintiffs' citation to *Frey v. First National Bank Southwest*, which certified a class action for violation of the EFTA and Regulation E, is unavailing. No. 3:11-CV-3093-N, 2013 WL 11309592, at *4 (N.D. Tex. Feb. 20, 2013), *aff'd*, 602 F. App'x 164 (5th Cir. 2015). In that case, the defendant bank operated an ATM that lacked one of two mandatory fee notices. The common question was not, as Plaintiffs suggest, whether the defendants adhered to the statutory requirements. *See* ECF No. 56 at 16 (citing *Frey*, 2013 WL 11309592, at *4). Instead, the court identified several questions common to all putative class members, including whether the bank

operated the ATM, whether the bank could avail itself of any statutory defenses, and the period of time during which the notice was missing. *Frey*, 2013 WL 11309592, at *4. Because *Frey* was concerned with the violation of a single statutory provision based on a single practice by the defendant bank, it was possible to identify facts and legal issues that were common to all class members. Here, Plaintiffs' sweeping reference to "customers who were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations" invokes multiple statutory provisions that apply to a number of Defendants' duties in administering the Direct Express Program. Given the wide range of potentially violative conduct implicated by Plaintiffs' Regulation E "super-claim," the Court cannot readily identify a single factual or legal issue "whose resolution will affect all or a significant number of the putative class members." *Stewart*, 669 F.2d at 335.

Accordingly, Plaintiffs have also failed to carry their burden to "affirmatively demonstrate" commonality as to the Regulations E Class as it is currently defined. *Dukes*, 564 U.S. at 350. Their failure to satisfy their burden as to commonality also establishes their failure to prove typicality or predominance. FED. R. CIV. P. 23(a)(3); *see also Falcon*, 457 U.S. at 157 n.13.

While fail-safe classes are not prohibited in the Fifth Circuit, the class members must be "similarly linked by a common complaint," "alleging injury from a particular action." *Mullen*, 186 F.3d at 624 n.1. Because of the breadth of the proposed classes, the Court cannot discern from either definition the nature of Plaintiffs' "common complaint" or the "particular action" that allegedly caused their common injuries. The common questions identified in the Plaintiffs' briefing amount to mere restatements of the fail-safe class definitions and do not satisfy the requirements of Rule 23. *See Ituah by McKay*, 2020 WL 354949, at *7 n.1; *Dukes*, 564 U.S. at 350–52. Thus, the Court cannot certify either of the proposed classes at this time.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 62) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion for summary judgment is **GRANTED** as to (1) Plaintiff Simms's claim for breach of contract; (2) Plaintiffs Densmore and Kreegar's claims for violation of violations of 12 C.F.R. § 1005.11; (3) Plaintiff Almon's claim for violation of 15 U.S.C. § 1693f(d); and (4) all Plaintiffs' claims for negligence, negligence per se, and violations of the California Consumer Protection laws. The motion is **DENIED** as to all remaining claims.

It is further ordered, for the reasons set forth herein, that Plaintiffs' motion for class certification (ECF No. 56) is **DENIED WITHOUT PREJUDICE** as to both the proposed Breach of Contract Class and the proposed Regulation E Class. The Court grants Plaintiffs leave to file a renewed motion for class certification amending the proposed class definitions to cure the deficiencies identified in this order **no later than April 15, 2022**. Defendants shall file a response in opposition, if any, **within fourteen days** after the filing of the renewed motion.

It is so **ORDERED**.

**SIGNED** this 25th day of March, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE