**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOE ALMON, JON CARNLEY, CYNTHIA CLARK, JACKIE DENSMORE, JENNIFER KREEGAR, HAROLD MCPHAIL, JB SIMMS, KENNETH TILLMAN, on behalf of themselves and all others similarly situated | § § § § § § § | |
| *Plaintiffs* | § | |
| | § | |
| -vs- | § | SA-19-CV-01075-XR |
| | § | |
| CONDUENT BUSINESS SERVICES, LLC, COMERICA, INC.,  COMERICA BANK, | § § | |
| *Defendants* | § | |

**ORDER**

On this date, the Court considered Plaintiffs' second amended motion for class certification (ECF No. 82),[1] Defendants' response in opposition (ECF No. 75), Plaintiffs' reply (ECF No. 77), and the parties' arguments at the hearing held on August 5, 2022. After careful consideration, the Court issues the following order.

**BACKGROUND**

This action arises out of Defendants' administration of the Direct Express program, which provides prepaid debit cards to federal benefit recipients who receive their benefits electronically. Plaintiffs are current and former customers of Defendants Conduent Business Services LLC and Comerica, Inc. who assert that unauthorized users withdrew funds from their Direct Express accounts and that Defendants failed to properly respond to the fraudulent transactions, thereby violating the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, its implementing regulations ("Regulation E"), 12 C.F.R. § 1005.1, *et seq.*, and the Terms of Use that constitute the contract between the parties.

---

[1] Plaintiffs filed a second amended motion for class certification to correct certain clerical errors in their first amended motion (ECF No. 72), which were addressed at the August 5, 2022 hearing on this motion.

## I.    The Direct Express Fraud-Reporting Framework

The Direct Express program allows millions of Americans to receive social security, disability, veterans', and other federal benefits electronically through a prepaid debit card, rather than by paper check or direct deposit into a bank account. *See* ECF 56-2 (Direct Express FAQ); ECF No. 61-1, Declaration of Mitch Raymond (hereafter, "Raymond Decl.") ¶ 5. Comerica, Inc. and Comerica Bank (collectively, "Comerica") were awarded the contract for this program by the Bureau of the Fiscal Service–U.S. Department of Treasury in 2015 and again in 2020, and have been paid in excess of $415 million for heading the program. *See* ECF No. 66-1, Taylor Dep. at 38:20–39:24. Comerica, in turn entered into an agreement with Conduent Business Services, LLC ("Conduent") to administer the Direct Express program.[2] ECF No. 56-5, Raymond Dep. at 37:9–18. Each month, Direct Express enrollees automatically receive their benefits via direct deposit to their debit cards.

### A.    EFTA and Regulation E – Statutory and Regulatory Requirements

Because the Direct Express program involves the use of a debit card that is used to make cashless transactions electronically, it is governed by the EFTA and its related regulatory framework, known as "Regulation E". *See* 15 U.S.C. § 1693a; 12 C.F.R. § 1005.1 (2016).[3] Congress enacted the EFTA as part of the comprehensive Consumer Credit Protection Act (the "CCPA"), Pub. L. No. 95–630 § 2001, 92 Stat. 3641 (1978) (codified as amended at 15 U.S.C. § 1601 *et seq*.). The purpose of the EFTA, together with Regulation E, is to establish the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. 15 U.S.C. §

---

[2] In addition to Conduent, Comerica engaged a second entity—i2c, Inc.—to handle various customer service aspects of the Direct Express program, including claims of fraudulent transactions. *See* ECF No. 62 at 2. However, the parties do not dispute that all Plaintiffs to this action interacted with Conduent rather than with i2c, Inc. *See id.*

[3] Regulation E has since been revised in April 2019 and July 2020. Because the transfers at issue in this case occurred prior to those changes, the November 14, 2016 version of the regulation applies. Accordingly, all subsequent citations to Regulation E refer to the 2016 version.

1693(b). "The primary objective of EFTA, however, is the provision of . . . consumer rights." *Id.* Accordingly, "[t]he EFTA, like the [Truth in Lending Act ("TILA")] and other CCPA provisions, is a remedial statute accorded "a broad, liberal construction in favor of the consumer." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998) (citations omitted).

The statute provides that the customer must, orally or in writing, notify the institution of any errors relating to electronic fund transfers within 60 days of the customer's receipt of the bank statement or other document detailing the alleged erroneous electronic fund transfer. 15 U.S.C. § 1693f(a). Once the institution is properly notified, the institution is required to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." *Id.*

The EFTA includes mandatory requirements in 15 U.S.C. § 1693f and the applicable regulation—12 C.F.R. § 1005.11—including several provisions related to timing. First, Defendants are required to investigate promptly and determine whether an error occurred within ten business days of receiving notice from the cardholder. *See* 12 C.F.R. § 1005.11(c)(1). Second, if they are unable to complete the investigation within ten business days, they may take up to 45 days to investigate, provided a provisional credit is issued in the amount of the alleged error. *Id.* at (c)(2). Third, if the error involves an electronic funds transfer that was not initiated within the United States, 90 days are allowed. *Id.* at (c)(3)(ii). Collectively, these are referred to as the "10/45/90 requirements."

The financial institution may require written confirmation to be provided to it within ten business days of an oral notification of error if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent. If the written confirmation is not received within the ten-day period, the financial institution need not

provisionally recredit a consumer's account and cannot be held liable for treble damages. *See* 15 U.S.C. § 1693f(a). If a provisional credit is issued, the consumer is entitled to full use of the provisional funds during the pendency of the investigation. 15 U.S.C. § 1693f(c).

When the financial institution determines that an error did occur, the EFTA requires that it credit the consumer's account, with interest, within "one business day after such determination." 15 U.S.C. § 1693f(b). Conversely, if the financial institution determines that an error did *not* occur, "it shall deliver or mail to the consumer an explanation of its findings within [three] business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur." 15 U.S.C. § 1693f(d).

The institution's failure to comply with these rules gives rise to civil liability pursuant to 15 U.S.C. § 1693m. The EFTA additionally provides for treble damages where the financial institution fails to provisionally recredit a consumer's account within the ten-day period and either (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error. 15 U.S.C. § 1693m(e)(1). A financial institution is also liable for treble damages if it knowingly and willfully concludes that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation. 15 U.S.C. § 1693m(e)(2). Under its contract with Comerica, Conduent is evaluated on whether it complies with the 10-day, 45-day, and 90-day investigation requirements. ECF No. 56-5, Raymond Dep. at 39:17–23. Conduent and Comerica keep detailed records regarding whether Conduent has performed up to these standards. *See* ECF No. 56-15.

### B.   Terms of Use – Applicable Contractual Provisions

When a debit card is issued through the Direct Express benefits program, it is accompanied by a "Terms of Use" agreement (the "Agreement"). The Agreement details what procedures cardholders should follow if they believe their card has been lost, stolen, or compromised through unauthorized or fraudulent charges. Specifically, the Agreement directs customers to "Call the Customer Service number below or write to us at the address described below as soon as you can if you think an error has occurred in your Card Account." *See* ECF No. 31-1 at 2.

The Terms of Use also describe a claim-resolution process that tracks the requirements of the EFTA and Regulation E. Section 9 provides that, in case of errors or questions about transactions, cardholders should call the Customer Service number with the following information:

  a.  Your name and Card number.
  b.  Why you believe there is an error, and the dollar amount involved.
  c.  The approximate date when the error took place.

*Id.*; *see* 12 C.F.R. § 1005.11(b)(1)(i)–(iii) (setting forth notice requirements under Regulation E).

Section 8 limits a cardholder's liability with respect to fraudulent or unauthorized transactions on their accounts:

> Tell us AT ONCE if you believe your Card or PIN has been lost or stolen. Telephoning us at the Customer Service number is the best way of keeping your possible losses down. You could lose all the money associated with your Card. **If you tell us within two business days, you can lose no more than $50 if someone used your Card or PIN without your permission. If you do NOT tell us within two (2) Business Days after you learn of the loss or theft of your Card or PIN, and we can prove that we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.**
>
> If you can't telephone us, you can write to us at Direct Express, Payment Processing Services, P.O. Box 245998, San Antonio, TX 78224-5998. If you are a California resident you will not be liable for the $500 amount described above in any event. If you are a New York resident, your liability for the unauthorized use of the Card will not exceed $50.

ECF No. 31-1 at 2 (emphasis added).

## II.      Plaintiffs' Experiences with Conduent's Fraud-Reporting Process

Because the specific experiences of the named Plaintiffs bear on the parties' arguments as to adequacy and predominance, the Court will briefly describe them here.[4]

### A.   Jon Carnley

Plaintiff Carnley has received disability benefits through the Direct Express program since 2012. *See* ECF No. 59-3 at 188. In January 2019, Carnley submitted a claim for five unauthorized transactions totaling $247.76. ECF No. 62-19, Carnley Dep. at 104:13–22; ECF No. 59-3 at 341, 387, 393, 407–08. After an investigation, Direct Express found that there was a conflict in information regarding the transactions and denied Carnley's claims because it could not determine whether fraud occurred. *Id.* at 420–21.

Carnley alleges that Defendants failed to limit his losses to either $50 or $500 under Section 8 of the Terms of Use. *See* ECF No. 31 ¶¶ 61, 77. He further alleges that Defendants failed to provide a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶¶ 89, 221–22.

### B.   Joe Almon

Plaintiff Almon received Social Security retirement benefits through the Direct Express program. ECF No. 62-2, Almon Dep. at 9:1–2, 14:3–6. 46:6–9. In November 2018, Almon noticed two pending transactions on his account that he believed to be unauthorized. *Id.* at 17:1–11. Both transactions involved a business called "Joe Almon and Co" and, in total, they amounted to $793.78. *Id.* at 65:3–21. Almon reported the charges, first to a Direct Express Customer Service

---

[4] The Court's March 2022 Order presents a more comprehensive version of these facts. Here, the Court presents only those facts relating to claims that survived Defendants' motion for summary judgment and, accordingly, form the basis for the renewed motion for class certification.

representative and then to the Fraud Services Department. *Id*. at 55:6–56:4, 56:21–57:1, 75:2–8, 70:21–71:31, 77:9–14. In a letter dated December 15, 2018, Direct Express notified Almon that its investigation was complete and that his claim had been denied. *See* ECF No. 62-13.

Almon continued to challenge this claim, and in mid-January 2019, he received a provisional credit for the full amount of the disputed transactions while the investigation was pending. ECF No. 62-14. He spent the credit shortly thereafter and then stopped using the card altogether. *See* ECF No. 62-2, Almon Dep. at 89:7–11; *see also* ECF No. 62-15. In late February, Direct Express informed Almon that it had completed its investigation and that his allegations of fraud could not be confirmed. *See* ECF No. 62-16 at 3. Direct Express reversed the provisional credit but, because Almon no longer deposits any funds into his account, it continues to show a negative balance of $793.78. *See* ECF No. 62-17 at 2.

Almon alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See* ECF No. 31 ¶¶ 61, 77.

### C.  Harold McPhail

Plaintiff McPhail is a disabled veteran who received federal benefits through the Direct Express program. ECF No. 56-25, McPhail Decl. ¶ 3. McPhail has occasionally authorized his children to use his Direct Express card on his behalf. *See* ECF No. 62-23, McPhail Dep. at 13:6–9; *see also* ECF No. 59-3 at 1081, 1118.

In May 2018, after receiving inpatient treatment at a skilled nursing facility on April 17, McPhail and his family noticed three transfers from his account to a "Green Dot Card" on April 4 and 17, 2018. ECF No. 56-25, McPhail Decl. ¶¶ 4–5. All three transactions were funds transfers to Green Dot, a business that provides prepaid cards to customers, for a total amount of $17,000. *See* ECF No. 59-3 at 937–38. On May 11, 2018, McPhail and his daughter challenged the

transactions and were sent a fraud questionnaire, which they completed and returned to Direct Express. ECF No. 56-25, McPhail Decl. ¶¶ 7–8.

On June 25, 2018, Direct Express sent a letter denying McPhail's claim based on a "conflict in the information [he] provided and the information resulting from Direct Express's research." *Id.* ¶ 9. When McPhail's daughter called Direct Express to request the documents supporting the denial, she learned that the claim had been denied because the same type of Green Dot transfers had occurred in February and March 2018 and had not been disputed. *Id.* ¶¶ 11–12.

Thus, on July 14, 2018, McPhail filed another fraud claim with Defendants for the transfers in February and March, totaling $13,000. *See id.* ¶ 13. Direct Express sent another fraud packet, which McPhail and his daughter completed and returned to Direct Express, along with a copy of the police report they had filed. *Id.* ¶¶ 14–15. On August 14, 2018, Direct Express concluded its investigation and informed McPhail that it could not confirm that fraud had occurred and that his claim was being denied. ECF No. 59-3 at 1137. In response to the second denial letter, McPhail and his daughter again requested the documentation supporting the denial. ECF No. 56-25 ¶ 17; *see also* ECF No. 59-3 at 1049–50, 1134. Defendants have failed to provide any such documentation. ECF No. 56-25 ¶ 18.

McPhail alleges that Defendants have failed to provide him with a provisional credit, in violation of 12 C.F.R. § 1005.11, or provide a copy of the investigation documents, in violation of 15 U.S.C. § 1693f(d). *See* ECF No. 31 ¶ 139. He further alleges that Defendants failed to limit his losses to either $50 or $500 as required under Section 8 of the Terms of Use. *See id.* ¶ 140.

**D.  JB Simms**

Plaintiff Simms began receiving Social Security benefits at retirement and received them through a Direct Express card until his experiences with unauthorized transactions that gave rise to this dispute. ECF No. 62-20, Simms Dep. at 69:22–70:12.

In January 2017, Simms noticed certain transactions that he believed to be unauthorized. *Id.* at 91:13–92:15. Simms orally reported the first array of these transactions (six in total, amounting to $53.80) to Direct Express within two days after they appeared on his account. *See* ECF No. 59-3 at 1682. When Direct Express failed to deliver a fraud questionnaire to provide written confirmation of his claim in a timely manner, Simms mailed a written narrative outlining the fraudulent transactions to Direct Express. ECF No. 56-22 ¶ 6; ECF No. 59-3 at 1682, 1700–02. Simms received a letter dated March 9, 2017, informing him that Direct Express had closed out his claim, without providing a refund because he had not provided further information to substantiate his claim. *See* ECF No. 59-3 at 1698. Simms asserts that, despite his request, Defendants failed to provide him with a copy of the documents supporting their determination that the transactions were not fraudulent. ECF No. 56-22, Simms Decl. ¶ 8. For three of these transactions (totaling $51.54), Simms was able to convince the merchant to refund the charge. *See* ECF No. 62-20, Simms Dep. at 63:15–21; ECF No. 56-22 ¶ 9. The remaining transactions that Simms challenged—unsuccessfully—amounted to $2.26. *See* ECF No. 62-21.

On December 10–11, 2017, Simms disputed five additional transactions totaling $246.97. See ECF No. 59-3 at 1681. He followed up his oral notice of the transactions with written confirmation via fax on December 17. *See id.* at 1721; ECF No. 56-22, Simms Decl. ¶ 12. On December 20, 2017, Direct Express sent a letter approving Simms's claim in part and informing Simms that a credit in the amount of $81.11 had been posted to his account. ECF No. 59-3 at 1722.

9

On January 2, 2018, Direct Express issued a second letter denying Simms's claim as to the remaining transactions based on a merchant refund on December 29, 2017. ECF No. 59-3 at 1727. Simms again requested a copy of the documents supporting this denial, which Defendants failed to provide. ECF No. 56-22, Simms Decl. ¶ 15.

Simms alleges that Defendants failed to provide a copy of the investigation documents upon which they relied in making their determination that the transactions were not fraudulent, in violation of 15 U.S.C. § 1693f(d). *See id.* ¶ 164.

### E.  Jackie Densmore

Plaintiff Densmore is the payee for disability benefits that her brother-in-law receives as a result of his military service. ECF No. 62-18, Densmore Dep. at 82:5–85:1, 95:18–23. In August 2018, Densmore learned that someone had contacted Direct Express claiming to be her and reported that the card had been damaged and asked for a replacement. *Id.* at 105:6–10; ECF No. 56-30, Densmore Decl. ¶¶ 7–8; *see also* ECF No. 59-3 at 685–86 (Direct Express call log). Then, two days later, someone claiming to be Densmore requested $802.82 be transferred from the account to a MoneyGram card, to be picked up at a Wal-Mart Superstore in Hollywood, Florida. ECF No. 56-30, Densmore Decl. ¶ 5. Defendants allowed this transaction to proceed, even though both Densmore and her brother-in-law live in Massachusetts. *Id.* ¶ 6.

Densmore immediately challenged this transaction and her account was credited in full. ECF No. 62-18, Densmore Dep. at 114:10–14; ECF No. 59-3 at 705. Despite Densmore's explicit requests, Direct Express failed to provide her with the results of the investigation into the fraud on her brother-in-law's account. ECF No. 56-30 ¶ 19.

### F.  Kenneth Tillman

Plaintiff Tillman previously received monthly social security disability benefits through a Direct Express debit card. ECF No. 56-32, Tillman Decl. ¶ 3. On August 1, 2018, while attempting to withdraw cash at a supermarket in Colorado, his card was declined for insufficient funds. *Id.* ¶ 6. The Direct Express representative he reached through the Customer Service line identified two unauthorized transactions at stores in California totaling over $700 on Tillman's Direct Express account, and informed Tillman that someone was, at the time of the call, attempting to make a purchase with his card. ECF No. 56-32, Tillman Decl. ¶ 8; *see also* ECF No. 59-3 at 1943; ECF No. 62-1, Tillman Dep. at 46:16–47:3, 50:18–51:5, 116:12–22.

After taking steps to cancel Tillman's card, the representative directed him to contact the Direct Express Fraud Services Department once the transactions closed to report the earlier unauthorized transactions. ECF No. 62-1, Tillman Dep. at 113:5–114:11; ECF No. 59-3 at 1943. On Monday, August 6, Tillman called the Fraud Services Department. *Id.* at 114:9–11. Following this phone call, Direct Express sent Tillman a "fraud packet" to assist in substantiating his claims, which he promptly completed and returned to Direct Express. *Id.* at 117:15–20, 123:8–124:4.

The Direct Express Fraud Services Department responded to Tillman's claim in a letter dated August 20, 2018, stating that Direct Express had posted a credit to Tillman's card to cover the entire amount of the challenged transactions. *See* ECF No. 62-5; *see also* ECF No. 62-6. Conduent's records indicate that the credit adjustment occurred on August 20. ECF No. 59-3 at 1905.

Tillman alleges that Defendants failed to provide him with a provisional credit, in violation of 12 C.F.R. § 1005.11, and failed to provide him with the results of their purported investigation in a timely fashion. ECF No. 31 ¶ 181.

### G.  Cynthia Clark

Plaintiff Clark is the caretaker for her adult son, who receives disability benefits through the Direct Express program. ECF No. 62-7, Clark Dep. at 13:1–9, 57:1–58:22. On November 2, 2018, after receiving a low balance alert, Clark contacted Direct Express and discovered several pending transactions that she did not recognize. *Id*. at 32:17–33:10, 84:4–15; *see* ECF No. 59-3 at 424 (Direct Express call log). After the transactions closed, on November 4, 2018, Clark called Customer Service again to close her account, referencing the unauthorized charges and further fraudulent transactions that had posted after her first call, including a purchase at a Best Buy in Minnesota, even though Clark lived in Georgia. *Id*. at 95:17–97:21; ECF No. 56-29, Clark Decl. ¶¶ 4–7; *see* ECF No. 59-3 at 424. On November 14, 2018, Clark called Customer Service again and was transferred to the Fraud Department to dispute the unauthorized charges, totaling $1,509.47. ECF No. 62-7, Clark Dep. at 94:23–95:12, 98:23–99:24; ECF No. 59-3 at 12–13, 17, 24. Direct Express sent her a fraud packet, which she completed and returned. *See* ECF No. 59-3 at 434–44.

On November 28, 2018, Direct Express sent two letters to Clark. In the first, Direct Express informed her that based on the results of an investigation, Direct Express had posted a credit to her son's account in the amount of $985.73, resolving her fraud claims with respect to four of the transactions she reported. *See* ECF No. 59-3 at 450. The second letter informed Clark that Direct Express had issued a provisional credit to her account in the amount of $523.74 while Direct Express continued the investigation into her remaining claims. *Id*. at 451. After completing the investigation, Direct Express made those provisional credits permanent. *Id.* at 454–55.

Clark alleges that the provisional credit was untimely, and that Defendants failed to provide her with the results of their purported investigation. ECF No. 31 ¶ 98.

### III.  Procedural History

This case is a continuation of an action originally filed on February 12, 2019, in the United States District Court for the Northern District of Georgia.[5] *Almon v. Conduent Business Services, LLC*, No. 1:19-cv-00746-LMM (N.D. Ga. Feb. 12, 2019). In that case, Judge May granted Defendants' motion to dismiss the non-Georgia Plaintiffs' individual claims due to lack of personal jurisdiction. *See Almon*, ECF No. 29 at 13–14, 19–24. The non-Georgia Plaintiffs promptly renewed their claims against Defendants by filing this action on September 5, 2019. ECF No. 1. On January 20, 2020, Plaintiffs filed an Amended Class Action Complaint, the operative pleading, consolidating what remained of the Georgia case into this action, and asserting claims for breach of contract, violations of the EFTA and Regulation E, and several causes of action arising out of an alleged data breach affecting the Direct Express program. *See* ECF No. 31.

On July 20, 2021, Plaintiffs moved for class certification as to their claims for breach of contract and for violations of the EFTA, seeking certification of two proposed nationwide classes:

> All Direct Express customers who, within the applicable statute of limitations period preceding the filing of this action and through the date of class certification, were denied a refund in violation of Defendants' Terms of Use (the "Breach of Contract Class"); and

> All Direct Express customers who, within the applicable statute of limitations period preceding the filing of this action through the date of class certification, were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations (the "Regulation E Class").

ECF No. 56 at 6.

While briefing on the motion for class certification was ongoing, Defendants filed a motion for summary judgment. ECF No. 62. Defendants argued that Plaintiffs' claims for breach of contract and violations of the EFTA failed as a matter of law because, in the few instances where

---

[5] Defendants have agreed that the statute of limitations for all claims of the Georgia Plaintiffs and all class claims by all Plaintiffs will be based on the initial filing date of the Georgia case. ECF No. 31 ¶ 21.

the challenged transactions were not fully refunded, Defendants' investigation and resolution of the claims complied with the requirements of the EFTA and the Terms of Use. *Id.* at 5–6.

In March 2022, the Court issued a 57-page order on both pending motions. *Almon v. Conduent Bus. Servs.*, LLC, No. SA-19-CV-01075-XR, 2022 WL 902992, at *1 (W.D. Tex. Mar. 25, 2022). Addressing Defendants' substantive attacks on the named Plaintiffs' claims, the Court began by resolving key interpretive questions presented in the summary judgment briefing.

With respect to the breach of contract claims, the Court concluded, *inter alia*, that whether Section 8's cap on losses applies depends on whether the Card or PIN was *actually* used without the cardholder's permission, and whether a reported loss was the result of an unauthorized use was a question of fact. *Almon*, 2022 WL 902992, at *14–15. In other words, the Court rejected both Plaintiffs' position that Section 8 applied to all *reported* losses and Defendants' contention that Section 8 applied only to losses *approved* by the Direct Express Fraud Department. *Id.*

Addressing Plaintiffs' statutory claims, the Court first held that Plaintiffs had standing to assert claims for violations of the EFTA and Regulation E, even where they had been fully refunded. *See id.* at *16–18. The Court further concluded that a customer's contact with Direct Express Customer Service concerning an allegedly fraudulent transaction was sufficient to trigger the duty to investigate under Regulation E and, accordingly, to start the clock by which the timeliness of the investigation and any provisional credits must be measured. *Id.* at *19. Finally, the Court endorsed Defendants' view that the EFTA and Regulation E permit a financial institution to take up to eleven business days to correct an error on a consumer's account and up to thirteen business days to notify the consumer of the results of its investigation. *Id.* at *20 (citing 15 U.S.C. §§ 1693f(a), (d) and 12 C.F.R. § 1005.11(c)(1)).

14

Proceeding to the motion for class certification, the Court found that Plaintiffs had satisfied the Fifth Circuit's implied prerequisite that the putative class be "adequately defined and clearly ascertainable," *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007), "by reference to objective criteria." *Brown v. Mid-America Apartments, LP*, No. 1:17-CV-307-RP, 2018 WL 3603080, at *10 (W.D. Tex. May 22, 2018). The Court rejected Defendants' objection that identifying putative class members would require a manual review of its business records because "a defendant may not avoid certification of a class by arguing their business records are not efficiently organized and maintained." *Cleven v. Mid-Am. Apartment Communities, Inc.*, 328 F.R.D. 452, 467–68 (W.D. Tex. 2018) (citing *In re Monumental Life Ins.*, 365 F.3d 408, 417, 419 (5th Cir. 2004).

Finally, the Court reached the class certification requirements enumerated in Rule 23. The Court found that Plaintiffs had satisfied the numerosity element of Rule 23(a)(1) and, based on its summary judgment analysis, identified a number of common questions whose resolution would affect a significant number of putative class members' claims for breach-of-contract and violations of the EFTA. *See Almon*, 2022 WL 902992, at *25–27. Nonetheless, the Court concluded that it could not certify the proposed classes because they were defined too broadly to identify these common issues based on the class definitions alone. *See id.* at *27–28.

Here, the Court noted that both proposed classes were fail-safe classes—classes in which "the class definition precludes the possibility of an adverse judgment against class members; the class members either win or are not in the class." *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012) (internal quotation omitted). The proposed breach of contract class included Direct Express customers who "were denied a refund in violation of Defendants' Terms of Use." ECF No. 56 at

6. Likewise, the proposed Regulation E class included Direct Express customers who "were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations." *Id.*

While the Fifth Circuit has rejected a rule against fail-safe classes, the class members must nonetheless be "similarly linked by a common complaint," "alleging injury from a particular action." *See In re Rodriguez*, 695 F.3d at 369–70. Because of the breadth of the proposed classes, the Court could not discern from either definition the nature of Plaintiffs' "common complaint" or the "particular action" that allegedly caused their common injuries. As drafted, the proposed breach of contract class appeared to extend to all denied refunds, rather than those denied in violation of Section 8 of the Terms of Use (i.e., refunds for allegedly unauthorized transactions exceeding the contractual limits on liability). Similarly, the proposed Regulation E class was both over- and under-inclusive. Plaintiffs' sweeping reference to "customers who were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations" invoked multiple statutory provisions applicable to a number of Defendants' duties in administering the Direct Express program. Given the wide range of potentially violative conduct implicated by Plaintiffs' Regulation E "super-claim," the Court could not readily identify a single factual or legal issue whose resolution would affect all or a significant number of the putative class members. The proposed class also appeared to exclude claims arising out of Defendants' failure to promptly provide a copy of investigative materials upon request, as required under 15 U.S.C. § 1693f(d).

Because the Court concluded that Plaintiffs had failed to establish commonality, it denied the motion for class certification and did not reach the remaining certification requirements. Nonetheless, the Court granted Plaintiffs leave to file a renewed motion for class certification amending the proposed class definitions to cure the deficiencies identified in the order. *Almon*, 2022 WL 902992, at *28.

Plaintiffs have renewed their motion for class certification, now seeking certification of four classes:

(1)  **The Breach of Contract Class:** All Direct Express customers who, within the applicable statute of limitations period preceding the filing of this action and through the date of class certification, were denied a refund for allegedly unauthorized transactions that exceed the contractual limits on liability in Section VIII of Defendants' Terms of Use.

(2)  **The 13-day Deadline Class:** All Direct Express customers who were not sent the results of an investigation within 13 business days of submitting a notice of error in accordance with 15 U.S.C. § 1693f(a)(3) and 12 C.F.R. § 1005.11.

(3)  **The Provisional Credit Class:** All Direct Express customers who were not given a provisional credit in the amount of the alleged error in accordance with 15 U.S.C. § 1693f(c) and 12 C.F.R. § 1005.11.

(4)  **The Investigative Documents Class:** All Direct Express customers who were not timely provided a copy of the investigative documents upon request in accordance with 15 U.S.C. § 1693f(d) and its implementing regulations.

ECF No. 82 at 6–7. For the Classes based upon the EFTA and Regulation E, the Class Period is from February 12, 2018, one year before filing, through the date of class certification. Plaintiffs also move to be appointed Class representatives and for the appointment of their counsel as Class Counsel. *Id.* at 6. Defendants continue to oppose class certification, arguing that liability in this case will turn on fundamentally individualized questions that make class resolution of Plaintiffs' claims inappropriate. *See generally* ECF No. 75.

## DISCUSSION

### I.  Rule 23 Standard

Class certification is governed by Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). The decision to certify is within the broad discretion of the district court, though that discretion must be exercised within the framework of Rule 23. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-01 (1981)). To

obtain class certification, a party must first satisfy Rule 23(a)'s four threshold requirements of numerosity, commonality, typicality, and adequacy of representation. *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008). The party must additionally satisfy the requirements of either Rule 23(b)(1), (2), or (3). *Id.* The party seeking certification bears the burden of establishing that the requirements of Rule 23 have been met. *Id.*

## II.     Rule 23(a) Threshold Requirements

The Court has already determined, and the parties do not appear to dispute, that Plaintiffs have satisfied the numerosity requirement. The Court will thus limit its analysis to the remaining elements.

### A.     Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The element aims to determine "whether there is a need for combined treatment and a benefit to be derived therefrom." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). The threshold of commonality is not high. *Id.* Rather, the commonality test is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). The interests and claims need not be identical. *Id.* The element "requires only that resolution of the common questions affect all or a substantial number of the class members." *Jenkins*, 782 F.2d at 472; *San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 442 (W.D. Tex. 1999) ("As long as class members are allegedly affected by a defendant's general policy, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied").

In its previous order, the Court recognized common questions arising out of both Section 8 of the Terms of Use and the EFTA based on its summary judgment analysis, but held that

Plaintiffs' proposed classes were too broadly defined to determine whether the questions would affect all or a significant number of the putative class members. *Almon*, 2022 WL 902992, at *26–27. Plaintiffs have now cured the deficiencies in their original class definitions, and, as discussed below, the Court is satisfied that there are common questions affecting a significant number of the members of each of the four proposed classes.

Defendants' position that there are no common questions affecting a significant portion of the proposed classes is unavailing. To the extent that many of the key interpretive questions have already been answered in the course of this litigation, the Court observes that those questions were only addressed before class certification because Defendants moved for summary judgment. *See Almon*, 2022 WL 902992, at *14–20 (addressing meaning of "loss," "lost or stolen Card or PIN," and "unauthorized transaction," and the notice and timing requirements affecting investigations and provisional credits under Regulation E). A defendant may not defeat class certification by frontloading key legal questions in a motion for summary judgment and then, once they have been answered by the court, arguing that no common questions remain for class resolution. That Defendants are now aware of how the Court will answer these questions on a class-wide basis does not change the fact that the answers will affect a substantial number of the putative class members.

Likewise, the Court's detailed analysis of the summary judgment record does not, as Defendants suggest, demonstrate that the facts are too individualized to support commonality. *See, e.g.*, ECF No. 75 at 8 ("At bottom, the Court's determination of Plaintiffs' contract claims necessitated an individualized analysis of each and every Plaintiff's unique facts and circumstances."). Instead, the Court conducted an exhaustive review of the evidentiary record because many of the arguments in Defendants' motion for summary judgment were premised on their faulty understanding of certain factual distinctions. *See, e.g.*, *Almon*, 2022 WL 902992, at

*13 (rejecting Defendants' argument that Almon's negative account balance was not a "loss" under Section 8); *see id.* at *16–18 (rejecting theory that Plaintiffs who had been refunded lacked standing to raise EFTA claims); *see id.* at *19 (rejecting position that complaints of fraud reported to Customer Service, rather than the Fraud Department, did not trigger a duty to investigate under the EFTA). Even in rejecting these arguments, however, the Court was obviously compelled to describe the facts that purportedly supported them. In other words, much of the factual analysis in the Court's summary judgment order will be unnecessary at trial because the Court has already disposed of many of the allegedly individualized inquiries as immaterial.

Moreover, in the few instances in which Defendants prevailed on their motion, the Court relied exclusively on Defendants' business records to determine that summary judgment was appropriate. *See id.* at *13 (citing Simms's client file as evidence that his net loss of $2.26 did not exceed Section 8's $50-cap and thus could not support a claim for breach of contract); *id.* at *21 (rejecting Densmore and Kreegar's arguments that they should have been credited within one day of reporting "obvious" fraud because the business records did not indicate that Direct Express made a fraud determination on the same day the fraud was reported); *id.* at *22 (noting absence of request for February 2019 investigative documents in Direct Express's log of contacts with Almon). At bottom, Defendants' commonality objections appear to be misplaced complaints that ascertaining the putative class members in this case will be resource intensive. As noted in the Court's previous order, however, "[e]ven if a manual review is needed to ascertain the members of the class, certification is still permissible if the plaintiff has shown that the class is identifiable by objective criteria. *Id.* at *24 (citing *Cleven*, 328 F.R.D. at 467 and *McKeage v. TMBC, LLC*, 847 F.3d 992, 999 (8th Cir. 2017) (affirming ascertainability where court had required counsel "to hire reviewers to manually inspect each" customer file)). The Court used objective data drawn

from Direct Express's own business records in reaching these conclusions. Regardless of how much time it takes Defendants to discern from its records which customers reported fraud on their accounts and how their claims were resolved, the relevant questions are not subjective—a customer either reported unauthorized activity or did not; a claim was either refunded or was not; an investigation concluded in ten business days or did not. For their part, Plaintiffs appear to agree that their claims will rely largely, if not exclusively, on Defendants' records.[6] In short, Defendant's protests about the specificity of the facts required to identify putative class members fail to defeat commonality.

### 1.    *The Breach of Contract Class*

Plaintiffs submit that "[t]he big question as to the Breach of Contract Class is whether Defendants breached the form contract by failing to limit the losses to either $50 or $500 on claims for unauthorized transactions." ECF No. 82 at 15. This common question arises out of the performance of a form contract common to each member of the proposed class—all of the putative members of the Breach of Contract Class are subject to the provisions of Section 8. The putative class members have also all suffered the same harm of losses to their accounts in excess of the caps on liability.  As the Fifth Circuit has recognized, "cases involving form contracts are often prime candidates for class certification because of the common interpretive questions at stake." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020); *see also Ellsworth v. U.S.*

---

[6] *See* ECF No. 82 at 11 ("Conduent maintains meticulous records of the fraud claims of the Class members during the Class Period. The Siebel database contains all the information needed to identify the members of the proposed Classes and calculate the damages of each. Siebel can also generate transaction history reports from which the total dollar amount of all transactions being disputed by a cardholder can be identified and tabulated. Plaintiffs' expert can use this data to readily calculate damages." (citations omitted)); *id.* at 14 ("Plaintiffs can readily use Defendants' records to identify Class members and calculate damages. Conduent stores the historical transaction information, including records of all fraud claims, in its Siebel database"); ECF No. 77 at 11 ("The undisputed facts establish that Defendants are contractually obligated to evaluate compliance with Regulation E and keep detailed records regarding whether Conduent has fulfilled its contractual standards. The reports are generated automatically, not after a manual review of each cardholder's activity for a particular month." (citations omitted)).

*Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *22 (N.D. Cal. June 13, 2014) ("when a form contract is at issue, courts in this district have held that a breach can be determined on a class-wide basis when the harm is the same and the contract terms are the same"). The Court's summary judgment analysis likewise confirms that there are interpretative questions at stake that satisfy the low threshold for commonality. *See Almon*, 2022 WL 902992, at *12–15 (addressing meaning of "loss," "lost or stolen Card or PIN," and "unauthorized transaction").

    2.    *The EFTA Classes*

    Plaintiffs assert that the common question as to the 13-Day Deadline Class is whether class members were sent the results of an investigation within 13 business days of submitting a notice of error in accordance with 15 U.S.C. § 1693f(a)(3) and 12 C.F.R. § 1005.11.  ECF No. 82 at 16. The common question as to the Provisional Credit Class is whether the class members were given a provisional credit in the amount of the alleged error in accordance with 15 U.S.C. § 1693f(c) and 12 C.F.R. § 1005.11. *Id.* The common question as to the Investigative Documents Class is whether Defendants provided class members with a copy of the investigative documents upon request in accordance with 15 U.S.C. § 1693f(d) and its implementing regulations. *Id.*

    As they are framed, these common questions clearly indicate that that EFTA Classes are fail-safe classes—"the class members either win or are not in the class." *In re Rodriguez*, 695 F.3d at 370. However, certification of fail-safe classes is possible in the Fifth Circuit as long as the class members are "similarly linked by a common complaint," "alleging injury from a particular action." *Mullen*, 186 F.3d at 624 n.1. While the EFTA Class defined in Plaintiffs' first motion for class certification—"customers who were not refunded in accordance with 15 U.S.C. § 1693f and its implementing regulations"—was too sweeping to identify a common complaint among the

putative class members, the redefined classes do not suffer from the same overbreadth. That is, the common complaints of the putative class members are clear from the class definitions themselves.

The Court agrees with Plaintiffs that there are common interpretive questions that will affect all or a significant number of the putative class members alleging claims based on the timeliness of their investigation and credits under Regulation E. *See Almon*, 2022 WL 902992, at *27 ("For example, there appears to be some disagreement about how to determine when the ten-day investigation timeline begins and how to determine when an investigation has concluded."). Such EFTA-based inquiries have been found to satisfy commonality. *See, e.g.*, *Frey v. First Nat'l Bank Sw.,* No. 3:11-CV-3093-N, 2013 WL 11309592, at *4 (N.D. Tex. Feb. 20, 2013), *aff'd,* 602 F. App'x 164 (5th Cir. 2015) (certifying EFTA class based on questions common to putative class members, including whether the bank could avail itself of statutory defenses and the period in which the statutorily required ATM fee notice was missing). The Court further observes that several questions common to the Investigative Documents Class will need to be addressed at trial, including the meaning of "prompt" delivery of the investigative materials and the proper measure of damages.

Finally, Defendants are contractually obligated to evaluate compliance with the EFTA and Regulation E, and Defendants keep detailed records regarding whether Conduent has fulfilled its requirements. *See* ECF No. 54-16. The reports are generated automatically, not after a manual review of each cardholder's activity. *See, e.g.*, ECF No. 56-6, Johnson Dep. at 107:6–108:8. The notion that Conduent's records are sufficiently detailed to identify violations for the purposes of tracking regulatory compliance but are somehow incapable of identifying the same violations for the purposes of regulatory enforcement strains credulity. The Court remains unpersuaded that the fact-specific nature of the investigation process defeats commonality as to the EFTA Classes.

### B.    Typicality

Pursuant to Rule 23(a)(3), a class may be certified only if the "claims or defenses of the representative parties are typical of the claims or defense of the class." FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding. It 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1990) (quoting *Lightbourn v. Cty of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)). When determining whether typicality is satisfied, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.*

Plaintiffs argue that their claims are typical of all members of the proposed classes. They assert that:

> (1) Almon and McPhail's claims for breach of contract are typical of the claims of the members of the Breach of Contract Class because Section 8's contractual limitation of liability was ignored;
>
> (2) The claims of Plaintiffs Almon, Tillman, and Clark are typical of the 13-day Deadline Class because they were not sent the results of their investigations within 13 business days of submitting a notice of error in accordance with 15 U.S.C. § 1693f(a)(3);
>
> (3) The claims of Almon, Tillman, and Clark are typical of the Provisional Credit Class because they were not given a provisional credit in the amount of the alleged error in accordance with 15 U.S.C. § 1693f(c); and
>
> (4) The claims of Carnley, Densmore, Simms, and McPhail are typical of the members of the Investigative Documents Class because Defendants failed to provide a copy of the investigation documents to these Named Plaintiffs upon request.

ECF No. 82 at 16–17 (citing *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 552 (W.D. Tex. 2020) (breach of the contract was uniform for both the plaintiff and the proposed class) and *Frey*, 2013 WL 11309592, at *4 (certifying EFTA-based classes where "[t]he claims all arise out of the same issue: whether [defendant] complied with EFTA")). Defendants do not appear to dispute Plaintiffs'

showing that they are typical of the classes they seek to represent and instead challenge the adequacy of the named Plaintiffs to represent the class, as discussed below. *See* ECF No. 75. Here, the Court is satisfied that, within each class, Plaintiffs' theories of liability and relief are identical for all putative class members.

### C.    Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The rule "mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). To certify a class, the court must find that class counsel is "qualified, experienced, and generally able to conduct the proposed litigation." *N. Am. Acceptance Corp. v. Amall, Golden & Gregory*, 593 F.2d 642, 644 (5th Cir. 1979). Additionally, "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129–30 (5th Cir. 2005) (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001)). Differences between named plaintiffs and class members do not necessarily make the plaintiffs inadequate representatives. *Mullen*, 186 F.2d at 625–26. The named plaintiffs are only inadequate if those differences create conflicts between the named plaintiffs' interests and the class members' interests. *Id.*

The Court finds that Plaintiffs' counsel has satisfied the adequacy requirement. The Vaught Firm, LLC and Webb, Klase & Lemond, LLC, have been lead or co-lead counsel in numerous class actions in the past, both in this judicial district and in several other federal judicial districts. *See* ECF No. 54-41. This demonstrates that counsel is "qualified, experienced, and generally able

to conduct the proposed litigation." *N. Am. Acceptance Corp.*, 593 F.2d at 644. Plaintiffs' counsel also certify that they have "impressed upon [Plaintiffs] the responsibilities of a being a class representative." ECF No. 82 at 18–19.

Finally, there are no apparent conflicts of interest between the named Plaintiffs and potential class members; indeed, their interests would be aligned, as they would all have the same incentive: proving that the Defendants' conduct violated the Terms of Use and the EFTA. The Court recognizes the potential for a *future* conflict of interest between the representatives of the Breach of Contract Class and potential class members. For example, Defendants' success in proving at trial that the transactions challenged by the McPhail or Almon were in fact authorized would create a conflict with class members whose transactions were actually unauthorized. At this stage, however, it is not clear that either representative is so different from putative members of the Breach of Contract Class that they cannot adequately represent the class. *Mullen*, 186 F.2d at 625–26. For these reasons, the Court finds that Plaintiffs satisfy the "adequacy of representation" requirement.

Having found that Plaintiffs have met the requirements of Rule 23(a), the Court now turns to the requirements of Rule 23(b).

## III.   Rule 23(b)(3) Requirements

After satisfying the prerequisites of Rule 23(a), a claimant must then establish that her class action can be maintained under either Rule 23(b)(1), (2), or (3). FED. R. CIV. P. 23(b). Here, Plaintiffs contend that the putative classes should be certified under Rule 23(b)(3), and, alternatively, under Rule 23(b)(2).

To certify a class under Rule 23(b)(3), the Court must determine that "questions of law or fact common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The purpose of Rule 23(b)(3) is to identify those actions in which certification of a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Courts typically address the predominance and superiority elements separately. *See, e.g.*, *Gene & Gene*, 541 F.3d at 326.

### A.    Predominance

The predominance inquiry requires courts "to consider how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (citation and internal quotation marks omitted). The inquiry "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Gene & Gene*, 541 F.3d at 326. Rule 23(b)(3)'s predominance requirement is "far more demanding" than the commonality requirement of 23(a) because the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem*, 521 U.S. at 623–24).

### 1.    The Breach of Contract Class

Plaintiffs assert that "[t]he central issue that will control the outcome is common to every Breach of Contract Class member: do Defendants breach their contract by denying refunds for allegedly unauthorized transactions that exceed the limitation of liability language contained in the Terms of Use?" ECF No. 82 at 10; ECF No. 77 at 9. They assert that "Defendants' uniform handling and processing of all fraud claims supports a finding of predominance." ECF No. 77 at 9

(citing *Spegele*, 336 F.R.D. at 552) (common questions predominated because the contractual provisions defendant's uniform conduct violated were materially identical for class members). Based on its reading of Section 8, the Court cannot agree. Indeed, the controlling question in many cases will likely be whether Section 8 applies at all—that is, whether there was an unauthorized use of funds.

Whether the reported loss was the result of an unauthorized use is a question of fact. *Almon*, 2022 WL 902992, at *15. Likewise, whether the $50 or $500 cap applied will depend on when the cardholder learned about the unauthorized transaction, when the cardholder reported the alleged fraud, and whether Defendants can prove that the loss could have been avoided if the cardholder had reported it earlier. *Id.* Defendants emphasize that individual questions permeate the class claims, including how Defendants investigated each report of fraud and their reasons for ultimately denying the requested refunds. *See* ECF No. 75 at 20–21. Plaintiffs respond that this argument is "contrary to the plain language of the contract and to federal law, which states that the burden of proof is upon the financial institution to show that an electronic fund transfer was authorized." ECF No. 77 at 9 (citing 15 U.S.C. § 1693g(b) ("In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized, or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability [for untimely notice] have been met . . .")). While Plaintiffs are correct that Defendants would bear the burden of proof at trial, the predominance inquiry does not end at the burden of proof—it requires the Court to consider how a trial on the merits would be conducted, identify the substantive issues controlling the outcome, and determine whether they are common to the class. *Gene & Gene*, 541 F.3d at 326.

At a trial on the merits, Defendants will first bear the burden of proving that the transactions challenged by the putative members of the Breach of Contract class were authorized. *See* 15 U.S.C. § 1693g(b). At the class certification hearing, Plaintiffs' counsel advanced a possible end run around the fraud inquiry, noting that deposition testimony had revealed that Defendants did not have a system in place for ensuring compliance with Section 8. Under this theory, Defendants would be liable for all reported fraud exceeding the limitations on liability because, without such compliance system, they cannot possibly satisfy their burden of establishing that Defendants could have stopped the fraud from occurring if the cardholder had reported the fraud earlier. See ECF No. 31-1 at 2; *see also* ECF No. 82 at 11 (suggesting a "mechanical method" for calculating damages by "generat[ing] transaction history reports from which the total dollar amount of all transactions being disputed by a cardholder can be identified and tabulated."). Unlike the rights granted under the EFTA and Regulation E, however, Section 8 does not afford a cardholder a procedural protection. Thus, the absence of a procedure for ensuring compliance with Section 8 does not in itself establish a violation of Section 8. Put differently, Defendants cannot be liable for violating Section 8 unless it applies to their conduct, and it applies only where there has been fraud. Plaintiffs do not cite any authority for the proposition that the Court can simply presume that fraud occurred for the purposes of class certification.[7] Indeed, it appears Defendants must be afforded the opportunity to prove that the reported transactions were authorized. *See* 15 U.S.C. § 1693g(b).

---

[7] Plaintiffs' citation to *Halliburton Co. v. Erica P. John Fund, Inc.* for the proposition that Defendants' "attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate" is misplaced because the plaintiff-shareholders in that case benefited from such a presumption. 573 U.S. 258, 260 (2014). Specifically, *Halliburton* involved the judicially created presumption set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *Basic* held that securities fraud plaintiffs could establish that they relied on the defendant's misrepresentations in buying or selling stock at the market price by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements. Thus, a plaintiff who bought or sold stock at the market price can be considered to have relied on those statements. This presumption is logical because the "market price" applies to everyone participating in the market and, everyone who bought or sold stock at the market price was directly affected by the market price. It follows that individualized evidence that a given stockholder did *not* rely on the defendant's misrepresentations is insufficient to

The threshold question of whether fraud occurred at all is a fact-intensive inquiry that will vary with the circumstances of each case, as the narratives of the putative class representatives— Almon and McPhail—easily demonstrate. Defendants denied Almon's claim, for example, because the challenged transactions involved a business bearing his name, "Joe Almon and Co." ECF No. 62-2, Almon Dep. at 65:3–21; ECF No. 62-16 at 3. They appear to have denied McPhail's claim, on the other hand, on the theory that one of McPhail's children had used his account. Direct Express concluded that the "Green Dot" transfers at issue were authorized because McPhail had occasionally given his children permission to use his Direct Express card, ECF No. 62-23, McPhail Dep. at 13:6–9; *see also* ECF No. 59-3 at 1081, 1118, and because the same type of transfers had occurred in February and March 2018 and had not been disputed. ECF No. 56-25, McPhail Decl. ¶¶ 11–12. It seems inevitable that answering this preliminary question in each case—whether the transactions at issue were authorized—will degenerate into a series of individual trials. *Gene & Gene*, 541 F.3d at 326. Indeed, the Court observed in its previous order that Defendants had not moved for summary judgment as to the named Plaintiffs' breach-of-contract claims and that "[a]ny such motion would be likely to fail because it would require the Court to 'make credibility determinations or weigh the evidence.'" *Almon*, 2022 WL 902992, at *15 (citing *Reeves*, 530 U.S. at 150).

If Defendants can satisfy their burden of establishing that a class member authorized the transactions in question, Section 8 is immaterial. In other words, Defendants have no obligation to limit the liability a class member faces for authorized transactions. Even assuming that Defendants

---

overcome the presumption as to all of the other putative class members who bought and sold the stock at the market price. Such a presumption is clearly not warranted here. Unlike the market price, which affects every shareholder who buys or sells stock at that price, Section 8's limitations on liability apply only in instances of actual fraud. Asking the Court to presume that Section 8 applied without evidence of fraud would be akin to applying the *Basic* presumption without evidence that a plaintiff had actually purchased or sold shares at the market price—it simply assumes too much.

fail to prove that a given transaction was authorized, however, there are several possible explanations for Defendants' failure to limit the cardholder's losses under Section 8. If Defendants' investigation was unreasonable, for example, they might have reached the erroneous conclusion that the transaction was authorized. Or, as Plaintiffs suggest, Defendants might have found that there was fraud but simply "ignored" the caps on liability. *See* ECF No. 82. It is also possible, for losses between $50 and $500, that Defendants determined that fraud occurred but that it could have been avoided if the cardholder failed to report the transaction within two days. *See* ECF No. 31-1 at 2 (Section 8 of the Terms of Use).

Plaintiffs cite several cases certifying class actions involving claims for breach of contract. In each of these cases, however, the allegedly violative conduct was both clear and uniform. *See Spegele*, 336 F.R.D. at 556 ("[B]ecause [d]efendant did not disclose how it calculated its [insurance rates], and it calculated these rates on a uniform basis, these elements are subject to common proof on a class wide basis."); *Vogt v. State Farm Life Ins. Co.*, No. 13–317, 2018 WL 1955425, at *6 (W.D. Mo. Apr. 24, 2018), *aff'd*, 963 F.3d 753 (8th Cir. 2020) ("The allegedly unauthorized charges result from the uniform application of the Policy's terms. All policy owners are subject to the same set of [ ] rates, and all [ ] rates are calculated using the same undisclosed factors."). While all members of the putative Breach of Contract Class are subject to Section 8 of the Terms of Use and all of them have suffered losses exceeding its caps on liability, the Court cannot detect the uniform conduct that gives rise to their claims for breach of contract.

The controlling questions in this case—whether there was fraud and, if so, why the loss exceeded the limitation on liability—require highly individualized inquiries into the circumstances of each challenged transaction that would overwhelm the class-wide interpretive questions concerning Section 8. FED. R. CIV. P. 23(b)(3). At trial, the class would ultimately disintegrate into

a series of mini trials. *Gene & Gene*, 541 F.3d at 326. Plaintiffs have not demonstrated that the proposed Breach of Contract class is sufficiently cohesive to warrant adjudication by representation and thus has not satisfied the "demanding" requirement of predominance. *Id.*

   2. *The EFTA Classes*

  Defendants insist that the claims by members of the EFTA Classes are "highly individualized" and thus not susceptible to resolution on a class-wide basis. *See* ECF No. 75 at 21–24. While the predominance test is more demanding than commonality, this Court's previous order and the summary judgment record clearly establish that individual inquiries are not necessary to determine whether an investigation was timely completed, whether a provisional credit was properly given, or whether or not Defendants timely provided a cardholder with their investigative documents. That determining class membership would be resource intensive does not mean that individual issues predominate. Indeed, Defendants do not identify any specific individual questions that would predominate over the merits questions and transform the trial on the merits of the EFTA Claims into a series of mini trials, nor can the Court locate any such questions in the accounts of the named Plaintiffs.

  As with their positions on commonality, all of Defendants' arguments as to predominance amount to complaints about the difficulty of ascertaining the putative members of each EFTA Class.  Given that Defendants already track compliance with the EFTA and Regulation E, the argument that identifying violations for enforcement purposes is a "highly individualized" inquiry is unavailing. For the same reasons set forth in the commonality analysis, the Court concludes that Plaintiffs have satisfied their burden of showing that questions of law or fact common to the putative members of the EFTA Classes predominate over any questions affecting only individual members.

**B.     Superiority**

In addition to the predominance requirement, Plaintiffs must also establish that the class

action is "superior to other available methods for fairly and efficiently adjudicating the

controversy. FED. R. CIV. P 23(b)(3). Rule 23(b) provides a list of factors to be considered: (a) the

class members' interests in individually controlling separate actions; (b) the extent and nature of

any litigation concerning the controversy already begun by or against class members; (c) the

desirability or undesirability of concentrating the litigation in the particular forum; and (d) the

likely difficulties in managing a class action. The superiority requirement is "fact specific and will

vary depending on the circumstances of any given case." *Robertson v. Monsanto Co.*, 287 F. App'x

354, 361 (5th Cir. 2008).

*1.     The Breach of Contract Class*

While the Breach of Contract Class cannot be certified because it fails to satisfy the

predominance requirement, the Court observes that it is unclear whether the class can satisfy the

superiority requirement either.

Plaintiffs argue that cardholders do not have a sufficient economic incentive to pursue their

claims in individually controlling separate actions. *See* ECF No. 82 at 12. Plaintiffs note that they

have identified only two previous lawsuits arising out of the Direct Express program. *See* ECF No.

82 at 19 (citing *Watson v. Direct Express Payment Processing Servs.*, No. 1:19-cv-00355-PAB

(N.D. Ohio) and *Goodwin v. Comerica Bank, N.A.*, 72 Cal. App. 5th 858, 864 (2021), *as modified

on denial of reh'g* (Jan. 5, 2022), *review denied* (Mar. 16, 2022)). The absence of other similar

litigation does suggest that individual putative class members do not have a strong interest in

controlling their own litigation. *Brown v. Mid-America Apartments, LP*, 327 F.R.D. 145, 153–54

(W.D. Tex. 2018); *see also* Newberg on Class Actions, § 4.70 (2017) (numerous cases would

suggest that individuals do have an interest in controlling their own litigation). To be sure, there are likely many instances in which a putative class member's potential individual recovery would be dwarfed by the cost of litigating individual claims. But there are also cases, such as McPhail's, in which the alleged loss of approximately $30,000 would appear to justify the cost and risks of litigation. *See also Watson*, No. 1:19-cv-00355-PAB (seeking $75,000 in compensatory damages and $100,000 in punitive damages, fees, and costs); *Goodwin* 72 Cal. App. 5th at 864 (confirming arbitration award of damages in the amount of $133,000 and attorneys' fees and costs totaling over $900,000).

Moreover, as with the Court's analysis of predominance, it appears that the varying evidence and circumstances bearing on whether each challenged transaction in each case was actually unauthorized would likely pose substantial difficulties in managing a class action. Plaintiffs have not established that the class action mechanism is superior to the other methods available for resolving claims under Section 8 of the Terms of Use.

## 2.    *The EFTA Classes*

With respect to the EFTA classes, on the other hand, the Court concludes that a class action is a superior method of adjudication. EFTA and Regulation E cases are particularly well suited to be class actions. Indeed, the EFTA specifically contemplates class actions in 15 U.S.C §1693(m). *See Burns v. First Am. Bank*, No. 04 C 7682, 2006 WL 3754820, at *10 (N.D. Ill. Dec. 19, 2006) (Regulation E claims providing for statutory damages are particularly appropriate for class treatment under Rule 23(b)(3)); *Flores v. Diamond Bank*, No. 07 C 6403, 2008 WL 4861511, at *4 (N.D. Ill. Nov. 7, 2008) (same).

In concluding that a class action is a superior method, the Court finds that the presumably low available recovery weighs in favor of a class action. For one, § 1693m provides for class action

recovery in "such amounts as the court may allow," except that, "as to each member of the class no minimum recovery shall be applicable." 15 U.S.C. § 1693m(a)(1)(B). Moreover, the policy underlying class actions is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). The number of members of each of the EFTA Classes are far too large, and the claims too small, for each member of the EFTA Classes to prosecute as a separate individual action. *See Almon*, 2022 WL 902992, at *16 ("That Defendants do not appear to even consider the possibility that their customers can suffer a 'concrete and particularized harm' from the untimely payment of credits—perhaps because the harm, to Defendants, appears minute—speaks to the core purposes of both consumer protection statutes such as the EFTA and the class action mechanism."). Without the class action mechanism in this case, there would be little incentive for an individual class member to file her own claim, and even if that class member wanted to, she might be unable to hire competent counsel for representation due to the low possible recovery. Finally, any class members that wish to pursue their own lawsuit can opt out.

The Court finds that Plaintiffs have met their burden of meeting the requirements of Rule 23(a) and 23(b)(3) with respect to the EFTA Classes. For that reason, the Court finds that certification of Plaintiffs' three classes of EFTA claims is appropriate.

## IV.    Rule 23(b)(2) Requirements

In addition to satisfying Rule 23(b)(3), Plaintiffs further assert that certification of the Classes is appropriate under Rule 23(b)(2), which applies where "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 329 (4th Cir. 2006). More simply stated, Rule 23(b)(2) certification is proper "if members of the proposed class would benefit from the injunctive relief*." Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 200 n.62 (5th Cir. 2010).

For the same reasons that Plaintiffs could not satisfy the predominance element under Rule 23(b)(3) with respect to the Breach of Contract Class, however, they cannot establish that putative class members would benefit from injunctive relief. That is, because the Court cannot identify a uniform practice or procedure that gives rise to the putative class members' claims for breach of contract, it is not clear how the Court could craft a remedy that would benefit the class as a whole.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' renewed motion for class certification (ECF No. 82) is **GRANTED IN PART** and **DENIED IN PART.** The motion is **DENIED** as to the Breach-of-Contract Class, and **GRANTED** in all other respects. Accordingly, the Court proceeds to "define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." FED. R. CIV. P. 23(c)(1)(B).

The Court certifies three separate classes under Federal Rule of Civil Procedure 23(a) and 23(b)(3). They are defined as follows:

(1) **The 13-day Deadline Class:** All Direct Express customers who were not sent the results of an investigation within 13 business days of submitting a notice of error in accordance with 15 U.S.C. § 1693f(a)(3) and 12 C.F.R. § 1005.11.

(2) **The Provisional Credit Class:** All Direct Express customers who were not given a provisional credit in the amount of the alleged error in accordance with 15 U.S.C. § 1693f(c) and 12 C.F.R. § 1005.11.

     (3)    **The Investigative Documents Class:** All Direct Express customers who were not timely provided a copy of the investigative documents upon request in accordance with 15 U.S.C. § 1693f(d) and its implementing regulations.

For the Classes based upon the EFTA and Regulation E, the Class Period is from February 12, 2018, one year before filing, through the date of class certification.

     The following are excluded from the class definitions: employees, officers, directors, or legal representatives of Conduent or Comerica; class counsel and their employees and experts; and the judicial officers and their immediate family members and associated court staff formerly or currently assigned to this case.

     The Court "must appoint class counsel" at this stage. FED. R. CIV. P. 23(g)(1). "[T]he language of Rule 23(g) 'recognizes the importance of judicial evaluation of the proposed lawyer for the class' and entrusts courts with ensuring fair and adequate representation of the class interests." *In re Toyota Hybrid Brake Litig.*, No. 4:20-CV-127, 2020 WL 6161495, at *14 n.18 (E.D. Tex. Oct. 21, 2020) (original alterations omitted) (quoting FED. R. CIV. P. 23 advisory committee's note to 1998 amendment).

     Where, as here, "one applicant seeks appointment as class counsel," the Court may appoint the applicant only if "adequate under Rule 23(g)(1) and (4)." FED. R. CIV. P. 23(g)(2). Under Rule 23(g)(1), the criteria that the Court must consider as to the applicant are: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A)(i)–(iv). Under Rule 23(g)(4), the Court must

consider whether the applicant, as class counsel, will "fairly and adequately represent the interests of the class."

The Vaught Firm, LLC and Webb, Klase & Lemond, LLC have been lead or co-lead counsel in numerous class actions in the past, in this judicial district and in several other federal judicial districts. *See* ECF No. 54-41.

After considering the criteria of Rule 23(g)(1) and (g)(4), the Court appoints Vaught Firm, LLC and Webb, Klase & Lemond, LLC as Co-Lead Class Counsel.

If the parties elect not to appeal under Rule 23(f), once the time period in which they may appeal the Court's decision expires, Plaintiffs shall have thirty (30) days to propose to the Court a method and form of individual notice for members of the certified classes. *See* FED. R. CIV. P. 23(c)(2)(B).

Because this case cannot proceed until either the resolution of an appeal of this order or the approval of a method and form of class notice, the Court finds this case is appropriate for administrative closure. *See Mire v. Full Spectrum Lending, Inc.*, 389 F.3d 163, 167 (5th Cir. 2014) ("District courts frequently make use of this device to remove from their pending cases suits which are temporarily active elsewhere (such as before an arbitration panel) or stayed (such as where a bankruptcy is pending). The effect of an administrative closure is no different from a simple stay . . . .").

The Clerk's office is therefore **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case pending further order of the Court. Though administratively closed, this case will still exist on the docket of this Court and may be reopened upon request or on the Court's own motion. Parties may continue to file motions and documents in the case.

It is so **ORDERED**.

**SIGNED** this 28th day of September, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE